338 So.2d 694 (1976)

STATE of Louisiana
v.
Jimmy T. SLAYTON.[*]
No. 58054.
Supreme Court of Louisiana.
November 8, 1976.
Dissenting Opinion December 16, 1976.
*695 S. Patrick Phillips, Bossier City, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John A. Richardson, Dist. Atty., Charles R. Lindsay, Asst. Dist. Atty., for plaintiff-appellee.
TATE, Justice.
The defendant Slayton was convicted of distribution of an illegal drug (methamphetamine), La.R.S. 40:968, and sentenced, as a multiple offender, La.R.S. 15:529.1, to twenty years at hard labor.[1]
On his appeal, we reverse his conviction and remand for a new trial. We find merit in his contention that evidence of other drug offenses were improperly and prejudicially admitted in evidence. Assignments of Error Nos. 1, 3, 4, 5, and 11.
As we will show in more detail, the state introduced evidence of other offenses of drug distribution to prove the defendant's participation in the present sale of an illegal drug with which he is charged. The other drug offenses occurred under totally different circumstances than the present offense.
The issue posed is whether these other offenses, completely independant of and unrelated to the present crime, are nevertheless admissible in evidence under the limited exceptions and for the limited purposes permitted by La.R.S. 15:445[2] and 446[3], i.e., to show knowledge, intent, or system.

I
Under our law, the state has the burden to prove beyond a reasonable doubt the accused's guilt of the specific crime charged. La.Const. of 1974, Art. 1, Section 16. Proof of present guilt may not properly be made by proof of general bad character or of prior criminal record or of other unrelated criminal activity. State v. Prieur, 277 So.2d 126 (La.1976).
To repeat again what we stated in this leading decision, 277 So.2d 126 at 128 (La. 1973):
"The admissibility of other acts of misconduct involves substantial risk of grave prejudice to a defendant. As to the prejudicial effect of evidence of other crimes, Wigmore says:
"* * * The natural and inevitable tendency of the tribunalwhether judge or juryis to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge. * * *" 1 Wigmore, Evidence § 194 (3rd Ed.).
"The probative value of evidence of unrelated offenses in relation to the charged offense should therefore be weighed in light of its possible prejudicial effect, its tendency to influence the triers of fact improperly as to the present guilt of the accused. See McCormick on Evidence, § 190 (Cleary Ed. 1972). . . .
"Evidence of crimes related to the offense with which a defendant is charged is inadmissible except under special exceptions. . . . McCormick on Evidence, § 190 (Cleary Ed.1972). Aside from related offenses admissible as part of the res gestae, and convictions admissible for impeachment purposes, Louisiana's statutes provide for only three exceptionsacts relevant to show intent, knowledge or system. * * "
*696 In State v. Moore, 278 So.2d 781 (La. 1973), we said: "* * * [T]here is always this second qualification to the admission of evidence of other offenses in a criminal prosecution: even if otherwise admissible, if the prejudicial effect outweighs the probative value of evidence of other offenses, such evidence should be excluded."
Subject to these principles, evidence of similar offenses may be admissible for the limited purposes provided by La.R.S. 15:445, 446 (quoted in footnotes 2 and 3 above). La.R.S. 15:446 concludes: "* * * where the offense is one of a system, evidence is admissible to prove the continuity of the offense, and the commission of similar offenses for the purpose of showing guilty knowledge and intent, but not to prove the offense charged."
However, where the extraneous crimes are introduced to prove system in connection with the present crime charged, "the common system used in both crimes must be so similar and individual as preponderantly to demonstrate that the perpetrator of both must be identical." State v. Waddles, 336 So.2d 810, 815 (La.1976).

II
The defendant is charged with participating in an illegal sale of methampetamine on August 1, 1973. The dissimilar extraneous offenses were committed in 1974 and 1975.
The August 1 offense charged took place as follows:
The actual drug sale occurred between Jerome Franklin, the seller, and Hawkins, an undercover federal narcotics agent. Earlier that evening, Hawkins agreed by telephone with Franklin to buy three pounds of methamphetamine for $3,200 per pound.
They agreed to meet at 10:30 p.m. in the parking lot of a motel to complete the sale. Hawkins was also informed that other persons would be in the area to make sure no one was robbed on either side. The only other person so identified was Richard Wilder, who had participated in the telephone negotiations.
Hawkins then arranged for other police officers to be in the vicinity of the parking lot. He was to signal (by putting on his coat) when the sale was completed, and then the officers were to arrest the participants.
Just before the agreed time, Hawkins parked on the motel parking lot. Shortly afterwards, a Buick containing two men (who later turned out to be Wilder and the defendant Slayton) parked near the concession stand of a closed service station next door. Within a few minutes, another vehicle driven by Franklin also parked in the service station lot a car length or so behind the Buick. (The waiting police officers thought they observed a glance of recognition exchanged between Franklin and the two men, now standing outside their Buick and watching the motel parking lot.)
Franklin then walked over to the motel. He met Hawkins by the latter's automobile, where Hawkins field-tested the drug to be sure it was genuine. He then gave the signal (put on his coat), and the waiting police officers arrested Franklin, and also the two men near the Buick on the adjacent premises (as well as at least one other individual waiting in a nearby car, who was apparently not involved in the incident).
The theory of the state's case was that the defendant Slayton, as well as Wilder, were principals in the illegal drug distribution, along with the actual seller Franklin. Slayton and Wilder were allegedly there maintaining watch to help protect their investment from hijacking or other mishap during the sale from Franklin to Hawkins.
Slayton, Wilder, and Franklin were all jointly charged with the offense. (Wilder and Franklin pleaded guilty and were state's witnesses at the trial.[4])

*697 III
Despite the state's strong case (see II above), it also, pursuant to proper Prieur pre-trial notices, introduced evidence of three other drug transactions:
James Dauman testified (a) that Slayton sold him ten grams of methamphetamine in January, 1974, (b) that in 1974 Slayton introduced him to Wayne Waldon as a source from which he (Dauman) could and did obtain methamphetamine, and (c) that on July 24 or 25, 1975, he had been able to secure a large quantitude of methamphetamine from Slayton for purposes of re-selling it.[5]
The circumstances of this July, 1975 transaction (for which Slayton was not on trial in this case) were then proved in detail by six witnesses, including Dauman and his wife, police agents, the chemist, and chain of custody evidence.
Dauman and his wife testified to the transaction as follows: Slayton came to Dauman's house, but he was out of town. Slayton pointed out to Dauman's wife where he had left a package containing amphetamines next to a utility box in the ditch right outside her fence. Dauman's wife picked it up and placed it behind her bed to keep it for Dauman's return.
The amphetamines were delivered to Dauman, according to him, as a result of a prior agreement between Slayton and himself. Dauman had agreed to pay Slayton for the drugs after he had re-sold them to his buyers (the undercover federal agents), to whom he had made two previous sales of amphetamines already (obtained from other sources than Slayton, he testified).

IV
The total dissimilarity of the July, 1975 offense to the present one (August 1, 1973) is obvious. Nor is there any similarity between the latter and the face-to-face 10-gram sale of January, 1974. Nor can we ascribe any admissible purpose to the testimony that Slayton introduced Dauman to a drug-seller so that Dauman could buy drugs. Assuming proof of "system" were here relevant, no system is proved by these extraneous crimes.
As noted in I above, proof of extraneous offenses unrelated to the crime charged is prejudicial to the right of a fair trial of guilt as to it. It is admitted only exceptionally, only to prove knowledge, intent, or system, and only when proof of such is probative of a genuine issue in the prosecution, and then only when the probative value outweighs its prejudicial effect. See also State v. Clark, 338 So.2d 690 (docket no. 58055, October 6, 1976); State v. Gaines, (docket no. 57,598, October 6, 1976); State v. Waddles, 336 So.2d 810 (La. 1976).
As noted, even if system were here relevant, the extraneous offenses here prove no "system". Nor do they here prove "intent", any more than proof that an accused has at some time committed the same crime (even though by a different method) ever does soand such proof of guilt of one crime by evidence of unrelated crimes of the accused is forbidden by our law. See I above.
Nor do these extraneous offenses prove "guilty knowledge", the final limited purpose for which this type of evidence may be admissible:
Extraneous offenses are sometimes permitted to be used as evidence to prove "guilty knowledge", when proof of such is required to establish guilt; but, in this sense, "guilty knowledge" is used to negate an innocent explanation for an undoubtedly unlawful act, as possibly done unknowingly.[6]
*698 In the guise of proving "guilty knowledge", however, the state cannot introduce unrelated other offenses to prove that presumably[7]lawful conduct (here, standing by a service station) was in fact done to accomplish an unlawful purpose as part of a crime. This is an attempt to prove by extraneous offenses that the defendant's presumably innocent conduct (standing by the service station) was in fact criminal; not that the accused had no defense to ostensibly unlawful conduct because he did not have "guilty knowledge" (when required for conviction of guilt as in certain crimes).
Here, the circumstances of the transaction proved that those who participated in it had guilty knowledge of its nature, and the real thrust of the proof of extraneous drug offenses was not to prove guilty knowledge but that, because of his past record, the accused Slayton was a principal participating in commission of the crime. See State v. Clark, 338 So.2d 690 (docket no. 58,055, October 6, 1976).
The decisions cited by the state are not apposite. State v. Medlock, 297 So.2d 190 (La.1974), concerned prosecution for possession with intent to distribute drugs which had been seized a few minutes after they arrived at the defendant's home in the mails; the other offenses were admissible to prove the requisite intent to distribute of the undoubted possession. State v. Banks, 307 So.2d 594 (La.1975), concerned the proof of an identical transaction between the same parties, closely related in time and place, to prove a genuine issue of disputed identification by the undercover-agent buyer. State v. Kibby, 294 So.2d 196 (La.1974), likewise concerned identical transactions between the same parties within a day of one another (conceding that its altermative holding on "guilty knowledge" is at variance with the views above expressed and the decisions there cited).
In the present case, the chief effect of the testimony of the extraneous offenses is to prove that the defendant had sold the present drug on two other occasions, and had known someone else who sold the drugs. As noted, traditionally our American concept of prosecution and conviction is that the state must prove the defendant guilty beyond a reasonable doubt of the crime actually charged, not that he may have committed it because he is a bad man who had committed other offenses on other occasions.
For instance: Assuming the state had no other evidence against the defendant than that he was standing in the vicinity when the drug sale occurred, the state would nevertheless wish us to affirm a conviction principally on the basis of the evidence that, on other occasions, by totally dissimilar methods and on dates and places far distant, he had committed the same crime with which he is now charged.[8]
The extraneous offenses erroneously introduced were apparently introduced to prove that the accused must be guilty of participating in this crime, since he was in the vicinity and could reasonably have been one of the principals, principally because he had engaged in (dissimilar) drug transactions in the past. The evidence principally served the prohibited purpose of placing the defendant's so-shown bad character before the jury, without being relevant to proof of any genuine issue in the case. The evidence as to these extraneous offenses therefore constitutes reversible error.

Decree
Accordingly, we must reverse the conviction and sentence, and remand to this case for a new trial in accordance with law.
REVERSED AND REMANDED.
*699 SANDERS, C.J., and MARCUS, J., dissent.
SUMMERS, J., dissents and assigns reasons.
SUMMERS, Justice (dissenting).
After Slayton's arrest on the night of August 1, 1973, he was released on bond. Thereafter he began to deal with James Dauman, another drug user and dealer. Dauman testified that on one occasion in January 1974 he bought ten grams of methamphetamine from Slayton.
Later, as part of his method of operation, Slayton introduced Dauman to another drug dealer, Wayne Ray Walden, and instructed Dauman to make further purchases from Walden. In July of 1975 Slayton delivered approximately three pounds of methamphetamine to the Dauman residence in Mooringsport. This methamphetamine was delivered to be resold, wholesale for $6,000 and retail for $14,000. As in previous transactions, Slayton made every effort to protect himself from being caught with drugs in his possession. When he delivered the methamphetamine to Dauman, he hid the package a short distance from the house, and pointed out its location to Mrs. Dauman, who later retrieved it.
The evidence admitted was relevant to show Slayton's guilty knowledge at the time of the August 1, 1973 offense; and to show, also, that the distribution in the August 1st offense was part of a system, scheme and plan to engage in the distribution of drugs.
This showing was particularly relevant in view of Slayton's contention that he had no knowledge that a drug sale was taking place a few feet away on the night of August 1st and that he was merely waiting for his friend Wilder to make a phone call at the Exxon Service Station. Moreover, the subsequent drug transactions involving the Daumans were relevant to establish Slayton's guilty knowledge, intent, motive and system.
This Court has consistently approved the admission of evidence of other offenses to show knowledge, intent, motive and system in drug transactions. One example is State v. Medlock, 297 So.2d 190 (La.1974), a case dealing with possession of LSD with intent to distribute. There evidence of sales of LSD was held to be admissible. Evidence of other offenses was recognized in that case to be of great value in establishing intent, an essential element of distribution. See also State v. Banks, 307 So.2d 594 (La. 1975); State v. Kibby, 294 So.2d 196 (La. 1974).
I would affirm the conviction.
NOTES
[*] Editors Note: The opinion of the Supreme Court of Louisiana, in State v. Neyrey, published in the advance sheets at this citation (338 So.2d 694), was withdrawn from the bound volume at the request of the court, and will be republished.
[1] See also earlier appeal, in which this court upheld the constitutionality of the proscription and description of methamphetamine as a controlled dangerous substance, La.R.S. 40:964, Schedule III A(2). State v. Slayton, 301 So.2d 600 (La.1974).
[2] La.R.S. 15:445 provides:

"In order to show intent, evidence is admissible of similar acts, independent of the act charged as a crime in the indictment, for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction."
[3] La.R.S. 15:446 provides:

"When knowledge or intent forms an essential part of the inquiry, testimony may be offered of such acts, conduct or declarations of the accused as tend to establish such knowledge or intent and where the offense is one of a system, evidence is admissible to prove the continuity of the offense, and the commission of similar offenses for the purpose of showing guilty knowledge and intent, but not to prove the offense charged." (Italics ours.)
[4] Although the testimony of Wilder and Hawkins was not transcribed (per instructions of counsel), the record (arguments of counsel and interrogation of Slayton) indicates that Wilder and Franklin testified in support of the state's theory that Slayton was a principal participating in the crime as alleged. Wilder testified that he had gotten the drugs from Slayton's house, and that then Wilder and Slayton had stopped on the way to the service station and had given the drugs to Franklin.

Slayton took the stand and denied any part in the transaction. He denied ever having seen Franklin before the arrest. He stated that Wilder had called him on the evening of August 1 to go for a few drinks. Allegedly, Wilder had stopped at the service station to call his girl friend, and Slayton had gotten out of the vehicle to drink a coke from the coin machine at the station's concession stand.
[5] His buyers turned out to be federal agents; Slayton was arrested and turned state's evidence.
[6] Thus, in State v. Johnson, 228 La. 317, 82 So.2d 24 (1955), the leading decision permitting use of extraneous offenses to prove "guilty knowledge" in narcotics cases, the undoubted possessor of marijuana, found in gleanings in his clothes, claimed not to know of them.
[7] We must always be mindful of the constitutional presumption of innocence. See La. Constitution of 1974, Art. 1, Section 16.
[8] Actually, the state seems to have had a fairly strong case, with direct evidence by co-principals of the defendant's participation in the crime. See footnote 4 above. We are unable to ascertain any valid reason for infecting the validity of the resulting conviction by the injection of these prejudicial extraneous offenses, non-probative of any issue of the prosecution, except to impress upon the jury the alleged bad character of the defendant so that it would not believe his sworn denials of his alleged confederates' implication of him in the crime. This is contrary to settled principle, see I above, as well as statute, cf. La.R.S. 15:481, 495.