375 So.2d 1170 (1979)
STATE of Louisiana, Appellee,
v.
John Duff ABERCROMBIE, Appellant.
No. 64185.
Supreme Court of Louisiana.
September 4, 1979.
Concurring Opinion October 3, 1979.
Rehearing Denied October 8, 1979.
*1172 Stephen R. Burke, Minden, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Patrick G. Quinlan, Asst. Attys. Gen., for plaintiff-appellee.
TATE, Justice.
The defendant was convicted of first degree murder and was sentenced to life imprisonment. La.R.S. 14:30 (1976); La.C. Cr.P. arts. 905-905.9. On appeal defendant relies on eight assignments of error.
Assignments of Error Nos. 3 and 7 present serious issues which concern (a) the admission of evidence concerning other crimes allegedly committed by the defendant and (b) legal insanity. We find no reversible merit to them or to the remaining assignments. We therefore affirm.
Context Facts
On the night of October 21, 1976, Father Ted Lelieveld, a Catholic priest, was shot twice in the chest when he answered a knock at his front door. He died shortly thereafter.
There were no eyewitnesses to the shooting. The following day a .38 caliber pistol was found near the scene of the crime, but the police still had no suspects. They concentrated on investigating several anti-Catholic incidents that had occurred in the surrounding area during the four preceding months.
A composite sketch was obtained from several witnesses to these prior acts of vandalism, assault, and battery. This composite reminded two policemen of a man they had stopped some weeks earlier. As a result the police visited the home of the defendant, where they saw three vehicles that matched descriptions given by the witnesses of the several prior incidents.
The police were admitted by the defendant's father. When they saw that the defendant matched the composite sketch, he was arrested for the prior acts of battery, assault, and criminal damage to property.
During the arrest the officers seized a box of .38 caliber shells and a cigarette pack with four .38 caliber shells. After obtaining a search warrant and searching further, some letters and tapes evidencing a strong antagonism towards the Catholic church were also seized.
Several days later the defendant was indicted for the first degree murder of Father Lelieveld.
The defendant was initially determined by a sanity commission to be incapable of standing trial. Eventually, however, he *1173 was found to be competent to stand trial, and he pleaded not guilty and not guilty by reason of insanity.
His motion for a change of venue and his motion to suppress the evidence seized at the time of his arrest were both denied. The trial court overruled the defendant's objection to a state pre-trial Prieur motion to permit the admission of evidence concerning the prior acts of vandalism and potential violence.
At his trial the gun, the bullets, the letters and tapes, and the other crimes evidence were all introduced. Other than cross-examination, the only evidence introduced by the defense was psychiatric testimony to the effect that if he had committed the crime he could not tell right from wrong. On rebuttal, the local coroner testified that he thought the defendant had known right from wrong.
The jury returned a verdict of guilty. After a sentencing hearing, the defendant was sentenced to life imprisonment.
Assignment 3 ("Other-crime" evidence)
The defendant assigns as error the admission of testimony concerning several acts of vandalism and assault and battery that the defendant allegedly committed against the Catholic church and its personnel during the four months preceding Father Lelieveld's death. Although we do not find merit to the assignment, it presents an aspect of other-crime evidence not previously considered in depth by us.
At a pre-trial hearing to determine the admissibility of these other crimes, the state argued that they were admissible to show intent, knowledge and motive. The trial judge ruled that the evidence was admissible.
The evidence of these other crimes, a simple battery and criminal damage to property, a simple battery and assault, and a criminal damage to property, was presented through the testimony of four witnesses (in a total of 39 pages of testimony included in a transcript of 332 pages of trial testimony):
(1) Father Vincent Elson of Ruston testified that he had been punched in the face by a man he had never seen before when he answered a knock at the front door of his rectory on Saturday, August 14, 1976, about two and one-half months before the present offense. He further testified that the man had thrown a brick at his head from halfway down the walkway.
Father Elson identified the defendant in court as the man who had punched him, and he also testified to an out-of-court photographic identification that he had made of the defendant. He described his assailant's vehicle as a green truck with a black stripe, a description which matched one of the vehicles found at the defendant's residence.
Mrs. Pat Wagner and Mrs. Ruth Dowden Johnston testified concerning some incidents which had occurred at their place of employment, Catholic Family Services, in Shreveport.
(2) Mrs. Wagner testified that a man had come into her office and slammed his fist on her hand on July 7, 1976, about four months before the offense. The man had not said a word and had driven away in a white older model car. The same man had appeared again on September 22, 1976, a month before the offense, and he had slapped the window of her office when he was unable to come in. This time he had driven away on a motorcycle. The descriptions of the two vehicles were consistent with the two vehicles (in addition to the truck observed by Father Elson) that were found at the defendant's residence.
Mrs. Wagner testified that she had assisted a police sketch artist in making a sketch. She identified the defendant in court as the man she had seen on these two prior occasions.
(3) Mrs. Johnston corroborated Mrs. Wagner's testimony concerning the man's attempt to get into the office on September 22, 1976; she also testified that on September 7, 1976, two weeks earlier, the same man had asked to see the "head honcho" and, upon being told that her boss was not there, had left a message "that John had been there and he had proven what needed *1174 to be proven." ("John" is the defendant's first name.) Mrs. Johnston had also helped the police sketch artist. She, like Mrs. Wagner, had seen the motorcycle and the white car. She likewise identified the defendant in court.
(4) Mrs. Robert DeLoach testified that she had seen a large man on a motorcycle standing in front of St. Margaret's Church, the victim's church, on October 7, 1976. Later it was discovered that some leaves of the church bible had been torn and the crucifix had been disturbed. Mrs. DeLoach was unable to identify either the defendant or the man she had seen at the church.
The state must prove beyond a reasonable doubt that an accused is guilty of the crime with which he is charged. La. Const. of 1974, Art. 1, Section 16. Therefore, proof of present guilt may not properly be made by evidence of general bad character or of different prior criminal acts. State v. Frederick, 340 So.2d 1353 (La.1976).
When evidence of other crimes is admitted there is a risk that the defendant will be convicted because he has been shown to be a bad man rather than because there has been proof beyond a reasonable doubt that he committed the crime for which he is being tried. As Wigmore says:
"* * * The natural and inevitable tendency of the tribunalwhether judge or juryis to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge. * * *" 1 Wigmore, Evidence, Section 194 (3rd Ed.).
In State v. Prieur, 277 So.2d 126 (La. 1973), this court recognized that "[t]he admissibility of other acts of misconduct involves substantial risk of grave prejudice to a defendant," and consequently "[e]vidence of crimes related to the offense with which a defendant is charged is inadmissible except under special exceptions." 277 So.2d 128. See McCormick on Evidence, Section 190 (2d ed. 1972).
According to McCormick, evidence of other crimes cannot be admitted unless the evidence is relevant for some purpose other than that of showing that the defendant is probably guilty because he is a man of criminal character. McCormick, Evidence, Section 190 at 447 (2d ed. 1972). See State v. Sutfield, 354 So.2d 1334, 1336 (La.1978). See also Wigmore on Evidence, Sections 55, 57, 194 (3d ed. 1940); Comment, Other Crimes Evidence in Louisiana, 33 La.L.Rev. 614, 615 (1973); Comment, Admissibility of Prior Criminal Acts as Substantive Evidence in Criminal Prosecutions, 36 Tenn.L. Rev. 515, 575 (1969).
In State v. Prieur, cited above, and its progeny, we have extensively delineated the scope of the three relevant statutory purposes for which other crimes evidence may be introduced. These three purposes are those set forth by the legislature in La.R.S. 15:445, 446to prove knowledge, intent, and system. (However, we have also had occasion to note other bases of independent relevancy, such as motive. State v. Sutfield, 354 So.2d 1334, 1336-37 (La.1978).)
The state argues that the evidence at issue here was relevant for three purposesto prove knowledge, to prove intent, and to prove motive. The former two, knowledge and intent, are covered by La. R.S. 15:445-446 and are governed by the rules that have been laid down in our extensive jurisprudence following Prieur.
As the defendant correctly contends, these decisions indicate that evidence of these other crimes was not properly admitted to show knowledge or intent. Knowledge was not an issue because the defendant did not attempt to give an innocent explanation for apparently unlawful conduct. See State v. Frederick, 340 So.2d 1353, 1355 (La.1976); State v. Slayton, 338 So.2d 694, 697-98 (La.1976); State v. Johnson, 228 La. 317, 82 So.2d 24 (1955).
Intent was also not a "real and genuine issue", State v. Moore, 278 So.2d 781, 785 (La.1973), because the defendant contended that he had not done the act at all, *1175 not that he had not had the requisite intent. State v. Frederick, 340 So.2d 1353, 1355 (La.1976). "[W]here the requisite intent is an inescapable conclusion from the act, it is uniformly held that other crimes evidence is inadmissible." Comment, cited above, at 33 La.L.Rev. 617-18. The defendant was not, for instance, claiming that he pulled the trigger by accident or mistake, or with only the intent to frighten, so as to make intent a genuine issue.
Even if intent has been a serious issue, the commission of a simple battery, an assault, and criminal damage to property were not relevant to show that the defendant had the specific intent to kill or inflict great bodily harm. State v. Slayton, 338 So.2d 694, 697 (La.1976).
To the extent that the defendant's specific intent was put at issue by his plea of not guilty by reason of insanity, the commission of these other crimes was not relevant on the issue of legal insanityto show that the defendant knew the difference between right and wrong, La.R.S. 14:14. In support of the state's case against legal insanity, the defendant was not shown to have known the difference between right and wrong when he committed these other crimes (in fact, the indication is that his behavior was irrational) that he committed these other crimes was simply not relevant to prove that, if he shot the priest, he did so with any knowledge that it was wrong.
However, in addition to knowledge and intent, the state argues that testimony concerning these other crimes was admissible to prove motive. "While intent and motive are frequently regarded as one and the same thing, there is a clear distinction between them. Motive is the cause or reason that moves the will and induces action for a definite result, while intent is the purpose to use a particular means to effect such result." Comment, Admissibility of Prior Criminal Acts as Substantive Evidence in Criminal Prosecutions, 36 Tenn.L.Rev. 515, 518 (1969).
In State v. Sutfield, 354 So.2d 1334, 1336-37 (La.1978), we recognized that evidence of other crimes may be admissible if the evidence is relevant to show motive, i. e., to show that the defendant had a reason to commit the crime he is charged with. Motive is generally recognized as an independent basis of relevancy. See McCormick, Evidence, Section 190 at 450-54 (2d ed. 1972); 2 Weinstein and Berger, Weinstein's Evidence, Section 404[09] at 404-53 (1979); Comment, Other Crimes Evidence in Louisiana, 33 La.L.Rev. 614, 617 (1973).
Nevertheless, "in order to have independent relevance, the motive established by the other crimes must be more than a general one, such as gaining wealth, which could be the underlying basis for almost any crime; it must be a motive factually peculiar to the victim and the charged crime." State v. Sutfield, cited above, 354 So.2d at 1337.
In addition, as with all evidence of other crimes that is independently relevant, other crimes evidence admitted to show motive must satisfy two tests: 1) there must be clear and convincing evidence that the defendant did indeed commit the other crimes, and 2) the probative value of the evidence must outweigh the risk of prejudicethe risk that the evidence will be used to convict the defendant because he is a man with a criminal disposition. State v. Sutfield, cited above, 354 So.2d at 1337. See McCormick, Section 190 at 452-54; Weinstein and Berger, Section 404[10] at 404-66.
The existence of these two additional tests is necessitated by the rationale behind the general prohibition against evidence of other crimes, the fear that a defendant may be convicted because of a criminal disposition rather than actual guilt. In order to minimize the risk of prejudice, it must be clear (a) that the defendant committed the other crimes and (b) that their probative value exceeds the risk of prejudice to the defendant.
Applying the above principles, we hold that the testimony of Father Elson (1), *1176 Mrs. Wagner (2), and Mrs. Johnston (3), was properly admissible to prove motive. The defendant was charged with an apparently senseless killing, so any evidence tending to prove that the defendant had a motive or reason for committing this crime was extremely probative.
The defendant's actions in attacking Father Elson, slapping Mrs. Wagner's hand, attempting to get into Mrs. Wagner's office, and leaving the cryptic message with Mrs. Johnston tended to prove that the defendant had a strong hatred for the Catholic church. This hatred gave the defendant a factually particular motive to attack a Catholic priest. The defendant's behavior illustrated a particular feeling against a small particular group, Catholic employees.
Since the evidence tended to prove a factually particular motive of great probative value in this case, the issue becomes whether the defendant's connexity with these other crimes was adequately established and whether the evidence's risk of prejudice outweighed its probative value.
In order to admit other crimes evidence, clear and convincing evidence must show that the defendant indeed committed the other crimes. State v. Sutfield, cited above, 354 So.2d at 1337. See McCormick, Section 190 at 451-52, Comment, Other Crimes Evidence in Louisiana, 33 La.L.Rev. 614, 620 (1973).
Because of the lack of a clear and convincing connexity with the defendant, the testimony of Mrs. DeLoach (4) was improperly admitted. She was completely unable to identify the man she saw as the defendant, and therefore this evidence should have been excluded. However, the other three witnesses, Father Elson (1), Mrs. Wagner (2), and Mrs. Johnston (3), were able to identify unequivocably the defendant as the man they had seen. Therefore, their testimony was admissible, unless its probativeness was outweighed by the risk of prejudice.
In balancing probativeness versus prejudice it is important to remember the reason for the rule; it is designed to prevent the jury from improperly convicting the defendant simply because he is a bad man or has committed other crimes. In the instant case, a first-degree murder trial, there was very little risk that the jury's objectivity would be swayed by evidence that the defendant had punched someone and thrown a brick at him and that he had hit someone's hand and slapped a window.
Certainly, some risk of prejudice resulted from these minor criminal episodes evidencing the defendant's strong anti-Catholicism. Nevertheless, this relatively slight risk of prejudice was outweighed by the probativeness of the evidence to the proof of the defendant's guilt of the act. Nor are we unmindful that proof of these acts was to some extent supportive of the accused's principal defense, that he was legally insane because of a paranoid schizophrenic condition.
We conclude, therefore, that the evidence of these last three witnesses was properly admitted to prove motive through these relatively minor crimes proceeding from an irrational hatred of Catholicism.
Although Mrs. DeLoach's, (4)'s, four pages of testimony should not have been admitted, we conclude that its admission does not constitute reversible error. As discussed above, the offender's minor vandalism at the church was not of a nature that would inflame a jury to the point that it would be influenced to convict an accused of first degree murder. In addition, the jury would most probably give it little weight, since Mrs. DeLoach's own testimony indicates the tenuous connection of the conduct to the defendant. In fact, the defendant's attorney did not even cross-examine the witness.
In summary, we conclude that all of the evidence of other crimes was properly admitted except the testimony of Mrs. DeLoach, but that the admission of her testimony, although erroneous, did not constitute reversible error.
The defendant additionally argues that the testimony of a fifth witness, Father Walsh of Minden, was improperly admitted as "other-crime" evidence. However unlike *1177 the other four witnesses, Father Walsh did not implicate the defendant in any criminal activity whatsoever. He testified only that a man came into or to his church three times and on one occasion launched into a tirade against the Catholic church. Since this testimony did not concern any crime committed by the defendant, the argument that it should have been excluded (based solely on the other-crimes objection) is without merit.
Accordingly, we find no reversible merit to this assignment.
Assignment 7 (Motions for a New Trial Evidence Of Legal Insanity?)
The motions for a new trial principally urge that the evidence does not support the conviction, arguing that the overwhelming preponderance of the evidence supports an acquittal by reason of insanity.
Our jurisprudence has held that the question of legal insanity is for the jury. State v. Rollins, 351 So.2d 470 (La.1977). Additionally, considering the defendant's burden of proving his insanity, we have consistently declined to reverse the trial judge's denial of a new trial sought, even when (as here) there is grave doubt as to the sufficiency of the evidence supporting a jury finding of sanity, where the record contains some evidence upon which they might base this finding. State v. Rollins, cited above.
In the instant case, the coroner, a general practitioner, testified that the defendant was not legally insanei. e., within the meaning of La.R.S. 14:14, he was not "incapable of distinguishing between right and wrong with reference to the conduct in question" "because of a mental disease or mental defect." This could be said to constitute some evidence so as to obviate appellate review by us.
When permitted by the court to testify as an expert (the coroner's qualifications as an expert on mental disease were contested, but we found no error, Assignment 5 in appendix), the coroner admitted that the accused's condition represented a severe form of paranoid schizophrenia, including the symptoms observed by three psychiatrists who similarly testified (such as that he was directed by a higher power to perform the acts he did). Nevertheless, unlike the psychiatrists, he was of the opinion that the mentally ill defendant knew right from wrong, because, for one reason, he knew that killing another human being was illegal.
This ultimate opinion, a deduction equally open to a layman or to a lawyer arguing the case, was discounted by all three psychiatrists. They were of the unanimous professional opinion that one of the results of the severe paranoid schizophrenia was that the accused, even though knowing it was humanly wrong to kill another human being, felt that obedience to the direction of the higher power absolved the act from moral wrong.
The psychiatrists did admit that the mental condition was subject to remission. However, all three of them (two having been on the sanity commission which examined the defendant shortly after his arrest) were of the firm opinion that the accused was not in a state of remission, but instead very much in the grip of his mental disease at the time of the offense. The psychiatrists likewise admitted that the very great preponderance of people suffering from this disease did know the difference between right and wrong, but again all three of them were of the firm opinion that the accused was in that very minute percentage of persons so afflicted who did not.
No lay evidence was introduced on the defendant's behalf. The only state evidence concerning his conduct or behavior were the four state witnesses who testified to his irrational acts directed against Catholic personnel and institutions. The investigating police officers did not testify as to his conduct or appearance. However, the state introduced into evidence some tapes made by the defendant prior to his arrest which contain irrational ramblings describing his "programming" by higher beings who controlled him and evidencing his obsessive hatred of Catholicism.
We have discussed the evidence in this detail because the United States Supreme *1178 Court, in Jackson v. Virginia, ___ U.S. ___, ___, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), seems to hold that federal due process mandates a broader standard of review of the sufficiency of the evidence to support a conviction than the "some evidence" rule. (We have discussed Jackson more fully in State v. Mathews, La., 375 So.2d 1165.)
Jackson seems to hold that the reviewing court must "determine whether the record evidence could reasonably support a finding of guilty beyond a reasonable doubt." 99 S.Ct. 2789. The test mandated is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found . . . beyond a reasonable doubt" that the defendant is guilty. 99 S.Ct. 2789.
Applying this test, we have little difficulty in finding that the evidence overwhelmingly supports a determination that, due to the accused's severe paranoid schizophrenia, he was irresistibly compelled to accept the perceived direction of the higher beings who he felt controlled him, by reason of which he did not know that it was morally wrong to kill the victim.
On the other hand, the expert evidence also admitted that the accused knew it was "humanly wrong," being illegal, to kill another human being.
The difficulty is that the M'Naughten test of legal insanity, i. e., being capable of distinguishing between right and wrong with regard to the conduct in question, is not in origin or application a medical or scientific concept.[1] The testimony and opinion of medical experts are almost essential for determining whether a mental disease or defect affected the defendant's conduct, and they also have weight in the decision whether because of this mental condition (as required) the accused could not distinguish between "right" and "wrong".
However, in the last analysis, it is rather a question of law than of medicine as to what the cognizable "wrong" is; a legal rather than a medical question is presented by the issue of whether an accused is legally insane who knows it is legally wrong to kill another human being, but who does not know it is morally wrong (being under a delusion or compulsion produced by severe mental disease). Indeed, the predominant practice in American jurisdictions seems without discussion to leave it to the factual determination of the trial jury to determine whether the defendant was capable of knowing right from "wrong" with regard to the conduct complained of, without specifying as a matter of law whether the defendant must know it to be "morally" or instead "legally" wrong. LaFave and Scott, Criminal Law 278-279 (1972). The jury is thus free to exculpate for legal insanity on either basis, providing that the inability to know is a product of a mental disease or defect.
As we apprehend our Louisiana jurisprudence, we have followed the latter practice in the application of the "right-wrong" test of La.R.S. 14:14. Therefore, we have not disturbed jury findings of sanity when the instructions to the jury have permitted it to find the accused sane if the accused knows it is "wrong" to commit the offense, without specifying that he must know it is either "legally" or "morally" wrong. That is, we have not as a matter of law required that there be exculpation by reason of legal insanity where the accused does not know his act is morally wrong because of "irresistible impulse" or some variation of this concept. State v. Johanson, 332 So.2d 270 (La.1976); State v. Berry, 324 So.2d 822 (La.1976); State v. Plaisance, 252 La. 212, 210 So.2d 323 (1968); State v. Bickham, 239 La. 1094, 121 So.2d 207 (1960); State v. Jenkins, 236 La. 256, 107 So.2d 632 (1958). As these decisions illustrate, we have until now noted the strong arguments against *1179 the restricted standard of legal insanity thus represented, but have preferred to leave to legislative revision any clarification or improvement of the statutory test and its jurisprudential interpretations by this court.
We therefore do not find merit to this assignment.
Other Assignments
The other assignments present substantial issues. However, they concern application of accepted legal principles to the particular facts of the present case, of interest only to the parties before us. We have discussed and rejected these assignments in an appendix to this opinion, which will not be published but which will remain part of the public records of this court.

Decree
For the reasons assigned, we affirm the conviction and sentence.
AFFIRMED.
SUMMERS, C. J., and MARCUS, J., concur in the result.
BLANCHE, J., concurs in result only and assigns reasons.
DIXON, J., dissents with reasons.
BLANCHE, Justice (concurring in result only).
Evidence of the defendant's mental ability to distinguish right from wrong with reference to his conduct was presented to the jury. That the jury chose to believe testimony favorable to a finding of sanity and mental responsibility was within their discretion and based upon evidence which they apparently regarded as more credible.
The standard (McNaughton) chosen by our legislature R.S. 14:14, would prohibit exculpation if one kills knowing it is legally wrong to kill even though the perpetrator may think it is morally right because of some delusion or irresistable impulse brought on presumably by some mental disease or defect.
With regard to the standard of review in federal habeas corpus cases as set forth in Jackson v. Virginia, ___ U.S. ___, 99 S.Ct. 2781 (1979), this writer regards due process as satisfied when the required number of jurors find on the basis of the evidence that it was sufficient to justify finding of proof beyond a reasonable doubt. While we refer to it as the "same evidence rule", regardless of what it is called it is, nevertheless, evidence sufficient in the jury's mind to justify in their hearts, minds and consciences the requisite degree of proof.
I otherwise concur in the majority opinion.
DIXON, Justice (dissenting).
I respectfully dissent.
The record is clear that defendant did not know the difference between right and wrong at the time of the offense. A civilized people should not ascribe legal responsibility to such an insane person even if he kills a Catholic priest. Our law does not permit it. To say the defendant knew it was illegal to kill is to avoid the issue of sanity.
NOTES
[1] See full discussion of M'Naughten rule at LaFave and Scott, Criminal Law 274-86 (1972), which includes criticisms and a full discussion of, for instance: whether the accused is excused if he knew it was legally wrong but thought he was morally right; the "irresistible impulse" theory of legal insanity; the entire subject of delusions, which historically gave birth to the M'Naughten rule.