733 So.2d 26 (1999)
STATE of Louisiana
v.
Elazab MUNEER a/k/a Muneer Elazab.
No. 98-KA-663.
Court of Appeal of Louisiana, Fifth Circuit.
January 13, 1999.
Opinion On Rehearing, March 10, 1999.
Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Ellen S. Fantaci, Assistant District Attorneys, Gretna, Louisiana, Attorneys for Plaintiff/Appellee.
Thomas G. Wilkinson, Stephen C. Grefer, Gretna, Louisiana and Jack M. Capella, Metairie, Louisiana, and Don C. Gardner, Harahan, Louisiana, Attorneys for Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA and THOMAS F. DALEY.
DALEY, Judge.
Defendant Elazab Muneer[1] appeals his conviction of aggravated cruelty to animals, a violation of LSA-R.S. 14:102.1. For the reasons that follow, we vacate the judgment of conviction of aggravated cruelty to animals, enter a judgment of conviction of simple cruelty to animals, and remand for resentencing.
On appeal, defendant argues that the trial court erred by convicting Mr. Elazab in a purely circumstantial case when there was insufficient evidence to exclude every reasonable hypothesis of innocence.

FACTS
This case involved the killing of a dog, Jo-Jo, on August 1, 1997. Ms. Terry Buck, the dog's owner, testified that in July of 1997 she owned two dogs, Jo-Jo and Gabby, both terriers. She told the jury that she lived in a one story house with a completely fenced yard. Ms. Buck said that in August of 1997 she had been dating the defendant Muneer Elazab, whom she called "Monty," for approximately 13 months. From February to August 1 of that year she would see the defendant approximately 2-5 times a week. *27 The defendant would usually spend Thursday nights with her at her home.
On Thursday, July 31, 1997, she met the defendant at a nightclub in Metairie at 9:30 p.m. After socializing and having some drinks, she and the defendant went back to her home at approximately 11:15. Upon returning to her house, the defendant fixed a hole in her fencing that would have allowed the dogs to get underneath the house.
Ms. Buck told the jury that the following morning she left her house at approximately 7:40 a.m. to go to work. When she left, the defendant was still in the house, and the defendant's truck, a green Suburban, was parked in front of the house. One dog, Gabby, was in the house. The other dog, Jo-Jo, was in the yard. The rear door to the house was equipped with a flap that covered a small hole that allowed the dogs free access between the fenced back yard and the interior of the house.
Ms. Buck testified that she returned to her home at approximately 11:40 a.m., unlocked the door and went inside. She testified that the yard gates were closed and locked and the doors locked when she came home. Only her dog Gabby greeted her in the window. Since Jo-Jo did not greet her at the door, she went into the house calling for him. She found Jo-Jo was lying on the floor by the bedroom door, dead. She noticed was that Jo-Jo's fur looked like it had gotten wet and been dried. She noticed that Jo-Jo was cold. She didn't see any blood in the house, or in front of the house.
Ms. Buck took Jo-Jo to the veterinarian, Dr. St. Germain, who informed her that he would do an autopsy of the dog to determine the cause of death. Later that afternoon, Ms. Buck returned home and looked around the house. Ms. Buck testified that upon investigation she noticed blood spots on a curtain near the back door, blood on the floor near the washer, a blood stain in the tub and underneath the bathroom faucets. Ms. Buck also noticed that there was blood on the bathroom rug, and it was very wet. She noticed a smear of blood in the bathroom that looked like it had been wiped clean, so she checked the washing machine, where she noticed four towels that had been washed. Ms. Buck testified that she did not place the towels in the machine. At that point Ms. Buck called her neighbor, Michelle Chauton, to look at the house. Ms. Chauton testified that she came over to Ms. Buck's house and saw what looked like dried blood on the bathroom sink, a spot on the bathroom floor where something had been wiped, and a couple of blood spots on the bathroom rug. Ms. Chauton testified that the bathroom rug was very wet.
Ms. Buck further told the jury that it was her opinion that the defendant didn't like the dogs in the house, and that Jo-Jo was scared of the defendant because he usually avoided the defendant. Ms. Buck testified that when the defendant would shower at her house, he would leave his towel on the bathroom counter or on the bed. Ms. Buck also said that there was no way for the dogs to get out onto the street.
Ms. Buck told the jury that nobody besides her father had access to a key to her home. Ms. Buck's father, Edwin Munch, told the jury that he didn't go to his daughter's house on August 1, 1997, and that his daughter's housekeys have never left his house.
Ms. Evelyn Pittman, Ms. Buck's across-the-street neighbor, told the jury that on August 1, 1997, between 9:30 and 9:45 a.m., she noticed the defendant's green Suburban parked in front of Ms. Buck's house.
Deputy Gerald Brewer of the Jefferson Parish Sheriff's Office testified that he met with Ms. Buck on the night of August 1, 1997. He testified that he thoroughly searched the house and saw no evidence of blood on the exterior of the house, particularly on the rear steps near the doggie door. Deputy Brewer testified that he noticed a small amount of a red substance *28 in the bathroom and on the curtain near the back door. He testified that his investigation revealed that there was no indication of any damage to the fence, no indication that the dog had dug his way out of the yard, and no sign of any sort of car accident.
Dr. Martin St. Germain testified as an expert in veterinary medicine. He told the jury that he had performed hundreds of autopsies, and performed approximately two to three a week to determine an animal's cause of death. Dr. St. Germain testified that he performed an autopsy on Jo-Jo on August 1, 1997. His autopsy revealed blood in the back of Jo-Jo's throat, bruises on Jo-Jo's rump, neck, chest, and abdomen, a crushed liver and blood in Jo-Jo's lungs. He determined that the cause of Jo-Jo's death was a liver injury that hemorrhaged. Dr. St. Germain particularly noted that Jo-Jo's coat was very clean, and he noted that the coat could not have been that clean without human interaction. It was Dr. St. Germain's opinion that Jo-Jo's liver injury was consistent with his being kicked since the force came from underneath the dog's body. Dr. St. Germain testified that he didn't believe that Jo-Jo was the victim of an automobile accident because of the immaculate state of Jo-Jo's coat, and because he had never seen the type of bruising that Jo-Jo sustained associated with vehicular trauma.
Dr. St. Germain testified that once the dog's liver was crushed, he couldn't have moved far. He would have expected to see blood at the location of the injury, and on Jo-Jo's face. Dr. St. Germain was of the opinion that he didn't see blood because somebody had washed Jo-Jo's mouth out subsequent to his death. Dr. St. Germain concluded that Jo-Jo's death was not due to an automobile accident, and that Jo-Jo's injuries were consistent with being abused. When asked on cross examination if Jo-Jo died from abuse, Dr. St. Germain indicated that he could not reach that conclusion without speculating.
The defendant testified on his own behalf. He told the jury that Ms. Buck was his acquaintance whom he dated approximately one year up until August 1, 1997. The defendant testified that on the evening of July 31, 1997 he and Ms. Buck met a few friends at a lounge called Legends, and returned to Ms. Buck's house around 11:00 p.m. When they arrived at her house, the defendant "staked up" the back fence near the yard. The defendant told the jury that the next morning, while he stayed in bed with a headache, Ms. Buck got up, went jogging, took a shower, and left for work. The defendant testified that after she left he took a shower, and cleaned up the bathroom. He told the jury that he made the bed and washed the clothes like he usually did when he spent the night at Ms. Buck's house. The defendant testified that he didn't recall what time he left, but that he didn't know where Jo-Jo was when he left, and he didn't have any contact with Jo-Jo that morning. He told the jury that he locked the door of the home when he left. The defendant further told the jury that he and Ms. Buck didn't go out every Thursday night, and that Ms. Buck was lying when she said he never did laundry. He recalled the dog spending most of his time outdoors. The defendant denied killing the dog.
The defense called several character witnesses, including the defendant's mother, to testify that the defendant would not harm an animal.[2] The defense also called Mr. G. Patrick Hand, who testified that he represented Ms. Buck's ex-husband during their divorce. He testified it took two years to settle the community, but that he never saw Mr. Buck as dangerous or violent.
*29 On rebuttal, Ms. Buck testified that her ex-husband did not have keys to the house, and further that he liked Jo-Jo and was sorry to learn of his death.
Based on the foregoing, the jury found the defendant guilty as charged.

ASSIGNMENT OF ERROR NUMBER ONE
The defendant, on appeal, argues that the circumstantial evidence submitted by the state in this case was insufficient to convict the defendant. Specifically, the defendant argues the evidence was insufficient because the State failed to exclude the hypotheses that the dog was killed as a result of a traffic accident or that the dog was killed by another person who entered the backyard.
The standard for reviewing the sufficiency of evidence was set forth in Jackson v. Virginia.[3] In Jackson, the court held that due process requires the reviewing court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[4] Under Jackson a review of a criminal conviction record for sufficiency of evidence does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. A reviewing court is required to consider the whole record, and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. The actual trier of fact is presumed to have acted rationally until it appears otherwise.[5]
When circumstantial evidence is used to prove the commission of the offense, LSA-R.S. 15:438 mandates that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." The requirement of LSA-R.S. 15:438 does not establish a standard separate from the Jackson standard, but rather provides a helpful methodology for determining the existence of reasonable doubt.[6] Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.[7]
In summary, when Ms. Buck left the home on Friday morning, she left the defendant home with two live dogs. When she returned for lunch, the defendant was gone, the house was locked, and Jo-Jo was dead of a blunt trauma to his liver, but his coat was freshly washed. The fence showed no signs that the dogs could or had escaped.
The defendant was convicted of LSA-R.S. 14:102.1(B)(1), aggravated cruelty to animals, which, at the time of the commission of the offense, required proof of this behavior[8]:
Any person who intentionally or with criminal negligence tortures, maims, mutilates, or maliciously kills any living animal, *30 whether belonging to himself or another, shall be guilty of aggravated cruelty to animals.
The defendant argues that the evidence was insufficient to convict the defendant because the State failed to exclude hypotheses that the dog was killed in an accident, or that another person entered the backyard and killed the dog. The defendant argues that the dog could have been killed in an automobile accident. However, Ms. Buck testified at trial that there was no way for the dog to get into the street. Dr. St. Germain testified that because of the immaculate state of Jo-Jo's coat, he did not believe that Jo-Jo was the victim of an automobile accident. Also, Dr. St. Germain told the jury that he had never seen the type of bruising that Jo-Jo sustained associated with vehicular trauma. Further, Dr. St. Germain said that with the type of injury that the dog sustained there would have been blood at the scene of the injury, and the dog could not have moved far. Deputy Brewer testified that there was no evidence of an accident, or blood on the street or anywhere on the exterior of the house, the steps, or the doggie door.
The defendant also raises as an hypothesis the possibility that someone entered the backyard and killed the dog. Dr. St. Germain testified, however, that he believed the dog's mouth had been washed out subsequent to his death. The defendant neglected to explain how the dog got back into a locked house, and washed his mouth out subsequent to his death. Dr. St. Germain testified that the dog's coat could not have been as clean as it was at the time of death absent human intervention.
The trial testimony showed that the defendant was in the house during the hours that the dog died, and that nobody else had access to the keys to the house, with the exception of Edwin Munch, who was not at the house that morning. The prosecution also presented evidence that the dog had bled in the bathroom and that some blood had been wiped up, and that towels were washed. Ms. Buck testified that she did not place the towels in the washing machine, and the defendant was the only one with access to the machine that morning. Finally, Dr. St. Germain testified that he believed the dog had been bathed subsequent to death.
Taking the evidence in the light most favorable to the prosecution, we find that the circumstantial evidence does not support a conviction for aggravated cruelty to an animal. The circumstantial evidence supports a finding that someone, most likely the defendant, kicked the dog. The prosecution, however, did not present any evidence of aggravating factors listed in the statute, either that the defendant intentionally or with criminal negligence tortured, maimed, or mutilated the dog, or "maliciously" killed the dog. The physical evidence did show that the dog sustained a blow, most likely a kick. However, we do not find that this evidence supports a finding of torture, maiming, or mutilation, or "malicious" killing.
LSA-C.Cr.P. Art. 905.4, Aggravating Circumstances, uses the following pertinent definition of an aggravation factor: "(7) The offense was committed in an especially heinous, atrocious or cruel manner." Torture is defined as "to inflict intense pain to body or mind for purposes of punishment... or for sadistic pleasure."[9]Maim is defined as "to cripple or mutilate in any way. To inflict upon a person any injury which deprives him of the use of any limb or member of the body, or renders him lame or defective in bodily vigor."[10]Mutilate is a synonym of maim. Malicious is commonly understood to mean with evil intent.
Dr. St. Germain testified that he did not want to speculate that the dog was abused because he did not know the entire story, although the injury was consistent with *31 abuse. Other testimony in the record by Ms. Buck showed that Jo-Jo did not like the defendant.
The prosecution did not prove "malicious intent" to kill the dog. To prove aggravated cruelty to animals, the prosecution must prove something more than the defendant "mistreat(ed) any living animal by any act or omission whereby unnecessary or unjustifiable physical pain, suffering, or death is caused to or permitted upon the animal." This is a definition of simple cruelty to animals, taken from R.S. 14:102.1(A)(1)(i). The evidence, viewed in the light most favorable to the prosecution, does not support a finding that defendant tortured, maimed, or mutilated Jo-Jo, and there is no evidence, direct or circumstantial, tending to prove that Elazab had the evil intent to kill Jo-Jo. While the jury apparently rejected the defendant's assertion that he had nothing to do with the dog's death, the prosecution's evidence does not exclude the reasonable hypothesis that the dog's death was accidental, that the defendant may have struck or kicked the dog but did not mean to cause the dog's death. The prosecution presented no evidence tending to show how the blow was delivered or what instrumentality was used. The prosecution presented no evidence on the amount of force necessary to rupture a dog's liver, nor can we guess if defendant intended the result. When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant "... that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt."[11] We find reasonable the hypothesis that the defendant may have kicked the dog but did not intend its death.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; the review reveals no errors patent in this case.
Thus, we reverse defendant's conviction of aggravated cruelty to animals, and accordingly enter a judgment of conviction of simple cruelty to animals, and remand for resentencing.[12]
CONVICTION VACATED; CONVICTION OF GUILTY OF SIMPLE CRUELTY TO ANIMALS ENTERED; CASE REMANDED FOR RESENTENCING.
GOTHARD, J., dissents with reasons.
GOTHARD, J., Dissents.
I dissent. Considering the standard for review pursuant to Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) as set forth in the opinion, the evidence presented was legally sufficient to convict the defendant on the charge brought against him. It is not the function of this court to overturn a jury verdict and re-try the defendant. Accordingly, I would affirm the conviction and sentence.

CONVICTION AFFIRMED
DALEY, J.

ON REHEARING
Defendant Muneer Elazab was convicted by a jury of aggravated cruelty to animals, a violation of LSA-R.S. 14:102.1(B)(1). On appeal, this court found insufficient evidence to support a conviction of aggravated cruelty to animals, and reduced the conviction to simple cruelty to animals, a violation of LSA-R.S. 14:102.1(A)(i).[1] The State filed a timely application and brief for rehearing. This court granted rehearing. Defendant filed *32 a reply brief to the State's application for rehearing.
In their application for rehearing, the State argues that this court misapplied the statutory law when it required that in order to obtain a conviction under Part B, the State must show that the animal was maliciously killed. The State points out that LSA-R.S. 14:102.1(B)(1) makes it illegal to torture, maim, mutilate or maliciously kill any living animal. The State argues that the medical testimony presented at trial established that the injuries sustained by the animal were so severe as to constitute torture and maiming. The State suggests that malice can be inferred based on the injuries sustained. The State acknowledges that the terms "tortures, maims, mutilates, and maliciously kills" were not defined for the jury, but disagrees with the definitions for those terms adopted by this court's original opinion and suggests that they should be construed according to the fair import of the words taken in their usual sense. The State argues that the jury properly applied the common usage of the requisite elements of the statute and concluded that the defendant tortured and maimed Jojo the dog.
In his brief, the defendant argues that the State's case against him was purely circumstantial, and the State did not exclude every reasonable hypothesis of innocence. Defendant argues that the State showed no evidence of torture, mutilation, maiming, or malicious killing, and that the evidence in the light most satisfactory to the prosecution shows only that the dog died as the result of a blunt trauma. Defendant argues that the fact that he was the last person seen in Ms. Buck's house before the dog was found dead is not sufficient to prove him guilty of any crime.
In 1995, the State Legislature amended and reenacted LSA-R.S. 14:102.1 to create the crime of aggravated cruelty to animals, which recognized the severity of certain offenses against animals and created a felony grade offense for those persons found guilty under the new subsection of the statute. By their action, the Legislature issued a strong policy statement that reflects contemporary society's desire that such offenses not be tolerated.
Upon additional review of the record and briefs, this court finds that the description of the dog's injuries by Dr. St. Germain, who performed the autopsy of the dog, taken in the light most favorable to the State, could have provided the basis for the jury's conclusion that the defendant tortured, maimed or maliciously killed the dog, and thus provided the basis for finding that the defendant was guilty of aggravated cruelty to animals rather that simple cruelty to animals. Dr. St. Germain testified that the dog, Jojo, suffered bruises on both of his hind quarters, his neck, chest and abdomen; the dog had an abrasion on his left ankle; his liver was ruptured resulting in massive internal bleeding, which caused his death. Dr. St. Germain testified that the injury to the liver was consistent with being kicked. While the defendant correctly asserts that no direct evidence was introduced that established that the defendant even touched the dog, and no direct evidence of malice was presented, the circumstantial evidence, particularly the severity of the injuries, taken in a light most favorable to the State, suggests that the defendant kicked the dog causing severe internal injuries. The medical evidence establishes multiple injuries that seemingly could not have been inflicted by a single blow. The medical testimony also rules out the possibility that the injuries were caused by an automobile accident as suggested by the defense. Considering the standard for review pursuant to Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the evidence was legally sufficient to convict the defendant on the charge brought against him. It is not the function of this court to overturn a jury verdict and re-try the defendant.
Therefore, we reverse our previous opinion issued on January 13, 1999, and we *33 HEREBY AFFIRM the defendant's original conviction of guilty of aggravated cruelty to animals, a violation of LSA-R.S. 14:102.1(B)(1).
CONVICTION AFFIRMED.
NOTES
[1] The record shows that the defendant's name is actually Muneer Elazab.
[2] Ms. Dawn Schnexyder, R., pp. 411-413, Mr. Peter Dale. R., pp. 414-416, and Ms. Nancy Werther, R., p. 420.
[3] 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and adopted by Louisiana in State v. Abercrombie, 375 So.2d 1170, 1177-1178 (La. 1979), cert. denied, Abercrombie v. Louisiana, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980). See also State v. Mussall, 523 So.2d 1305 (La.1988).
[4] Jackson, 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573.
[5] State v. Mussall, 523 So.2d at 1310 (La. 1988).
[6] State v. Captville, 448 So.2d 676 (La.1984); State v. Ruffin, 96-226 (La.App. 5 Cir. 8/28/96), 680 So.2d 85.
[7] State v. Burrow, 565 So.2d 972, 976 (La. App. 5 Cir.1990), writ denied, 572 So.2d 60 (La.1991); State v. Guccione, 96-1049 (La. App. 5 Cir. 4/29/97), 694 So.2d 1060, writ denied, 712 So.2d 869 (La.1998).
[8] Acts 1997, No 1212, amended 14:102.1(B)(1) to read "Any person who intentionally or with criminal negligence tortures, maims or mutilates any living animal, whether belonging to himself or another, shall be guilty of aggravated cruelty to animals."
[9] Black's Law Dictionary, Fifth Edition.
[10] Id.
[11] State v. Captville, 448 So.2d 676, 680 (La. 1984); State v. Chester, 97-1001 (La.12/19/97), 707 So.2d 973.
[12] See State v. Fortune, 608 So.2d 148 (La.1992)(judgment of conviction of greater grade of offense vacated, judgment of conviction of lesser grade offense entered).
[1] Judge Gothard dissented from this opinion and would have affirmed the original conviction.