385 So.2d 200 (1980)
STATE of Louisiana
v.
Joel A. VERNON.
No. 66186.
Supreme Court of Louisiana.
May 19, 1980.
Rehearing Denied July 7, 1980.
*202 Mark H. Kramar, Leesville, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Howat A. Peters, Jr., Dist. Atty. Ad Hoc, for plaintiff-appellee.
WATSON, Justice.[*]
Defendant, Joel A. Vernon, was charged by grand jury indictment with first degree murder in violation of LSA-R.S. 14:30. He withdrew his initial plea of not guilty and entered pleas of not guilty and not guilty by reason of insanity. Following trial by jury, he was convicted of the lesser included offense of second degree murder and sentenced *203 to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence for forty years. He appealed to this court with twenty-six assignments of error. Six of these assignments were declared abandoned in oral argument. Only eight of the remainder warrant discussion, the others being without merit and involving no novel or unsettled questions of law.

FACTS
Vernon was the owner of the Cave Bar in Leesville, Louisiana. On Halloween night, 1978, he, James Regallis and Timothy Bray were in the back room of the bar with Michael Melcher. Melcher was pressed to repay some debts. A gun was pointed at him, and there was a minor fracas in which Melcher received a small cut on the head.
Vernon, Regallis and Bray then ordered Melcher into Vernon's stationwagon and took him to the Vernon Parish sanitary landfill.
At the landfill, Vernon hit Melcher first, striking him in the stomach with a stick one and a half to two feet long and about an inch in diameter. Melcher's jacket was pulled down to immobilize his arms and the three men took turns kicking and beating him with the stick and a club almost six feet long and two inches in diameter. There was testimony that the men played baseball with Melcher: Vernon umpired, Regallis pretended to pitch and Bray swung the club, hitting Melcher. They also engaged in Russian roulette, Regallis and Vernon each firing a shot about a foot above Melcher's head.
Melcher was left lying on his back, rolling his head from side to side and moaning. The other three returned to the Cave Bar.
A short time later, Bray, Regallis and Dale Slama went back to the landfill in Vernon's car. Melcher had pulled off his belt and thrown it aside and had completely unbuttoned his shirt. He felt cold and didn't appear to be breathing. Slama removed Melcher's money and identification from his pockets and, with Bray's help, moved the victim deeper into the woods. Regallis set fire to the area of the beating to conceal blood, and the three men returned to the Cave Bar.
On November 2, 1978, Melcher's charred and beaten body was discovered by hunters at the landfill site.

ASSIGNMENTS OF ERROR NUMBER ONE, NINETEEN, TWENTY, AND TWENTY-ONE
Defendant contends that the trial court should have suppressed his confession. Vernon argues that he gave written statements because he was assured that the most serious offense for which he could be tried was aggravated battery. At trial, Vernon testified that, if he had known he would be charged with murder, he would have requested that a lawyer be present to advise him. (Tr., Vol. VII, p. 848).
This contention is without merit. Vernon was approached by the police for questioning in connection with the Melcher murder as he sat eating in a cafe in Leesville. He was taken into custody for carrying a concealed weapon and was advised of his rights. At the Vernon Parish Sheriff's office, he signed a pre-printed rights form as well as a consent to questioning form, indicating that he fully understood his rights, that he was willing to answer questions, and that no threats or promises were made. A verbal interview was conducted, and Vernon then gave a five page written statement typed by a police officer containing full Miranda warnings and Vernon's signature on each page. He was placed under arrest for murder after giving the written statement. After the arrest, he gave a tape recorded statement which was substantially the same as his earlier written statement.
The police officers present at the time the written statement was given testified that Vernon at no time indicated that he was tired or sleepy or that he wished to discontinue the interview. He was given food, drink and cigarettes and allowed to go to the restroom as he desired. They testified that no promises had been made to induce him to talk but one officer admitted telling *204 Vernon that, if he cooperated, it would be brought to the attention of the district attorney's office. That same officer stated that the subject of aggravated battery came up when Vernon, prior to giving the written statement, asked a police detective if he might be charged with an offense less serious than first degree murder. The detective advised Vernon that the police would charge him with first degree murder although the grand jury could indict him for a lesser offense.
High standards of proof for waiver of constitutional rights apply to in-custody interrogation. Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). When a statement is taken without the presence of an attorney, there is a heavy burden on the State to demonstrate that the accused knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. State in the Interest of Dino, 359 So.2d 586 (La.1978). Moreover, before a confession or inculpatory statement may be introduced into evidence, the State must prove affirmatively and beyond a reasonable doubt that the statement was free and voluntary and not made under the influence of fear, duress, menaces, threats, inducements, or promises. LSA-Const. 1974, Art. I, § 13; LSA-R.S. 15:451; LSA-C.Cr.P. art. 703(C); State v. LeJeune, 352 So.2d 619 (La., 1977); State v. McGraw, 366 So.2d 1278 (La.1978).
The State has met its burden. Defendant was adequately advised of his rights and consented to questioning. He acknowledged that he had not been promised anything in return for a statement. The testimony of the police officers specifically rebutted defendant's allegation that he had been promised a charge of aggravated battery. The mere fact that one officer told Vernon that the district attorney would be advised of any cooperation cannot be considered sufficient inducement to vitiate the free and voluntary nature of the confession. Vernon's claim is further eroded by his admission that he made a tape recorded statement after being charged with first degree murder.
These assignments lack merit.

ASSIGNMENT OF ERROR NUMBER SIXTEEN
Defendant contends that the trial judge erred in allowing into evidence photographs of the victim's body at the landfill site.
The test of admissibility of allegedly gruesome photographs is whether their probative value outweighs the possible prejudice that may result from their display to the jury. State v. Matthews, 354 So.2d 552 (La.1978). Photographs which illustrate any fact or which shed light on an issue, or are relevant to describe the person, place or thing involved are generally admissible. State v. Valentine, 364 So.2d 595 (La.1978). Photographs of a deceased victim may be relevant to prove the corpus delicti, to corroborate other evidence of the manner in which the death occurred, to establish the location, number and severity of the wounds and to establish the victim's identity. State v. Williams, 343 So.2d 1026 (La.1977); State v. Myles (La.S.Ct., 1979, Docket Number 63,567).
The photographs of Melcher corroborate testimony describing the scene of the crime, the severity of the beating, and the victim's clothing. The State did not attempt to use the photographs to prove that Vernon was in any way responsible for the burns. While the photographs show burns on the victim's body, the evidence at trial clearly indicated that defendant was not present when the fire was set. The photographs are distasteful and unpleasant but not so gruesome as to inflame the jury against defendant. The probative value of the photographs outweighs any prejudicial effect which may have resulted from their display.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER SEVENTEEN
Defendant contends that evidence of his arrest on a charge of carrying a concealed *205 weapon was improperly adduced by the State during the examination of arresting officer, Harold Stork.[1] He assigns as error the trial judge's refusal to declare a mistrial on the ground that the requirements of State v. Prieur, 277 So.2d 126 (La.1973) were not satisfied. See LSA-C.Cr.P. art. 770.
Generally evidence of extraneous offenses is inadmissible because of the prejudicial effect upon the accused's constitutional presumption of innocence. State v. Prieur, supra; State v. Morris, 362 So.2d 1379 (La.1978); Pugh, Louisiana Evidence Law 30 (1974). Such evidence is excluded to ensure that a defendant will not be presumed guilty because of past offenses. See McCormick on Evidence, Section 190 (2d Ed., 1972) Wigmore on Evidence, Sections 55, 57, 194 (3rd Ed., 1940).
LSA-R.S. 15:445, 446, sets out three purposes for which other crimes evidence may be introducedto prove knowledge, intent and system. If the State intends to introduce evidence of other crimes as allowed by that statute, notice of that intent must be given to defendant and it must be proved that the evidence meets the constitutional, statutory, and jurisprudential guidelines for admission. State v. Prieur, supra; State v. Morris, 362 So.2d 1379 (La.1978).
Testimony was adduced at the motion to suppress evidence that Vernon was initially arrested for carrying a concealed weapon, so the prosecutor should have anticipated Detective Stork's answer. Detective Stork's statement cannot be excused as unsolicited. See State v. Foote, 379 So.2d 1058 (La.1980). Pretrial notice should have been given of the State's intent to introduce the evidence and a determination should have been made of its admissibility.
Nevertheless, introduction of the evidence does not constitute reversible error. In light of the entire record, we cannot say that knowledge of Vernon's arrest for carrying a concealed weapon would so enflame the jury that it would unjustifiably convict the accused of second degree murder. See State v. Abercrombie, 375 So.2d 1170 (La.1979).

ASSIGNMENT OF ERROR NUMBER TWENTY-TWO
Defendant contends that the trial court erred in denying his Motion for Mistrial when he was asked if he had testified at the trial of James Regallis. It is argued that since the State may not comment on a defendant's post-arrest silence (Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) or his failure to testify in his own defense (State v. Johnson, 345 So.2d 14 (La. 1977), the State is also barred from commenting on his failure to testify at the trial of another.
When a defendant in a criminal case takes the stand to testify in his own defense, he is subject to all the rules applicable to other witnesses and may be cross-examined on the whole case. LSA-R.S. 15:462. State v. Rhodes, 337 So.2d 207 (La. 1976) stated:
"[A] defendant who chooses to waive his fifth amendment privilege by testifying may certainly be required to answer possibly incriminating questions pertinent to the case under consideration, if relevant. He may be cross-examined on the whole case." 337 So.2d 209.
However, the United States Supreme Court has held that a defendant's silence when arrested and advised of his Miranda rights may not be used to impeach an explanation subsequently offered at trial. Doyle v. Ohio, supra. The court in Doyle quoted Mr. Justice White, who concurred in *206 United States v. Hale, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975):
"... when a person under arrest is informed as Miranda requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony." 422 U.S. 182-183, 95 S.Ct. 2139-2140, 45 L.Ed.2d 108.
By analogy, it would seem impermissible to allow defendant's silence at the trial of another to be used against him at his own trial.
However, testimony was never before the jury which affirmatively showed that defendant did not testify at Regallis' trial. Vernon was asked if he had been requested to testify at that trial and answered affirmatively. When asked if he actually had testified, he was precluded from answering by the objection of his attorney. (Tr., Vol. VII, p. 832). The trial judge admonished the jury to disregard the references to his testimony or lack thereof at Regallis' trial and denied defendant's motion for mistrial. In light of these circumstances, we cannot say that the State impermissibly referred to defendant's failure to testify in his own defense so as to warrant a mistrial under LSA-C.Cr.P. art. 770. The trial judge's admonition to the jury to disregard the question was sufficient to assure defendant a fair trial.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER TWENTY-FIVE
This assignment relates to the trial court's refusal to grant a mistrial when reference was made to defendant's religious background. He contends that the prosecutor initiated an irrelevant line of questioning for the sole purpose of informing the jury that Vernon was Jewish.
LSA C.Cr.P. art. 770 provides that a mistrial is mandated, upon motion of defendant, when a remark or comment by a judge, prosecutor or court official refers to religion, if the remark is not material and relevant and might create prejudice against defendant in the mind of the jury.
Here, the issue of religion was raised by the defense. Defendant's mother testified on direct examination that Vernon had not been a rowdy or violent child and that, while in the service, had been an assistant to a chaplain. On cross-examination, after stating that her son had attended church while growing up, she was asked to specify which church he had attended. She answered "Temple B. Zion" (Tr., Vol. IX, p. 925). No mention was made that Temple B. Zion was a Jewish congregation or that Vernon himself was Jewish.
The testimony in question was relevant and material in that it was offered to show that defendant was taught the difference between right and wrong. Because it had been stated on direct examination that defendant was an assistant to a chaplain, the subject of religion was a logical one to raise on cross-examination. There was no showing that the remark would create prejudice in the mind of the jury and the trial court correctly denied the motion for mistrial.
This assignment lacks merit.
For the reasons assigned, the conviction and sentence are affirmed.
AFFIRMED.
DENNIS, J., dissents with reasons.
DENNIS, Justice, dissenting.
I respectfully dissent. The test of admissibility of a so-called "gruesome photograph" is whether its probative value outweighs its probable inflammatory effect. State v. Gilmore, 332 So.2d 789 (La.1976). In this case, the prejudice to defendant outweighs the probative value of the photos. The pictures are obviously gruesome. *207 Their probative value is minimal because they do not show with any clarity evidence of beatings inflicted on the victim by Vernon and his cohorts. The body of the victim had been badly burned by a fire set by Vernon's cohorts after he had left the scene and withdrawn from participation in their activities. Since it is clear that Vernon was not involved in the setting of the fire, prejudicial effects of the photos clearly outweighed their probative value.
NOTES
[*] Honorable Richard H. Gauthier participated in this decision as Associate Justice Ad Hoc.
[1] Detective Harold Stork testified on the circumstances surrounding the arrest of Joel Vernon. He stated that he and Detective Jody Dowden approached Vernon and Timothy Bray in a Leesville cafe to question them about the murder. Vernon and Bray consented to the questioning and were advised of their rights. When asked what transpired prior to their departure for the Sheriff's office, Stork stated that a frisk of Vernon revealed a .32 caliber revolver on his person. (Tr., Vol. VI, p. 681).