414 So.2d 340 (1982)
STATE of Louisiana
v.
Alvin R. MOORE, Jr.
No. 81-KA-1118.
Supreme Court of Louisiana.
May 17, 1982.
*342 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Henry N. Brown, Jr., Dist. Atty., for plaintiff-appellee.
J. Stacey Freeman and M. Randal Fish, Bossier City, for defendant-appellant.
WATSON, Justice.
Defendant, Alvin R. Moore, Jr., was convicted of the first degree murder of Jo Ann Wilson in violation of LSA-R.S. 14:30. The jury unanimously decided that the death penalty should be imposed on the basis of three statutory aggravating circumstances:
"(a) The offender was engaged in the commission or attempted commission of aggravated rape, aggravated burglary and armed robbery;
"(b) The offender knowingly created a risk of death or great bodily harm to more than one person;
"(c) The offense was committed in an especially heinous, atrocious or cruel manner." (Tr. 40)
Defendant has appealed his conviction and sentence assigning six errors by the trial court.

FACTS
Aaron Wilson, his wife Jo Ann, and their four month old daughter Regina resided at 804 St. Charles Street in Bossier City, Louisiana. Jo Ann Wilson was a slender woman, who weighed between 95 and 100 pounds. Alvin Moore, Jr. was a former neighbor and co-worker with Aaron at the V.A. Hospital. On July 9, 1980, Alvin Moore, Jr. picked up two companions, Arthur Lee Stewart, Jr. and Dennis Sloan, in his light blue 1962 Chevrolet. Moore and Sloan were twenty years old and Stewart nineteen. The three rode around Shreveport, visiting, laughing and talking. Moore then said he wanted to go to Bossier City to "check on his old house". (Tr. 584) Moore had previously resided at 833 St. Charles Street.
Observing that Aaron Wilson's automobile was not present, Moore went to the Wilsons' house with the announced purpose of getting "some money". (Tr. 631) According to Sloan, Moore knocked on the Wilson door, Jo Ann Wilson came to the door; she and Moore talked briefly and then entered the house together. Five minutes later, Sloan followed Moore to the door of the house. The door was cracked and Sloan saw Moore and Jo Ann Wilson "making sex" (Tr. 631) on the floor of the living room. Sloan returned to tell Stewart what was happening. Stewart and Sloan then entered the house. Moore and a crying Mrs. Wilson had gone into the bedroom where baby Regina was also crying. Moore was "going crazy", ransacking the house. (Tr. 593) Jo Ann Wilson was described as "panicky" and "scared". (Tr. 592) She appeared to be frightened of Moore. Jo Ann Wilson said: "take whatever you want, just get out of my house." (Tr. 612) and "just don't harm her or the child". (Tr. 632) *343 After being threatened, Mrs. Wilson had given a box containing Kennedy half dollars to Moore. Sloan took a white bucket with $18.80 in pennies, and Stewart took some stereo components. They left the house and heard Jo Ann Wilson screaming behind them.
Moore ran out about five minutes later carrying a knife in his hand. Stewart testified that this was the same knife that Moore had had on the back seat of his car as the group drove to St. Charles Street. Moore told Stewart and Sloan, "I'm fixing to trip you all out ... I stabbed that bitch nine times." (Tr. 594-595) The three then proceeded to Church's Fried Chicken and McDonald's.
Jo Ann Wilson managed to call the police emergency number. The call was received by the Bossier City Police Department at 9:40 P.M. and a unit was dispatched. Patrolman Fields knocked on the door in approximately two minutes; Jo Ann Wilson said she was unable to open it. He kicked in the door. There was blood all over the living room and the victim was lying on the bed in the bedroom. Both rooms were disarranged. Jo Ann Wilson was nude from the waist down, bleeding from her vagina, her chest and both arms. She was having difficulty in breathing, and told Officer Fields she was dying. He asked who had stabbed her and she responded "Elvin". When asked if she knew "Elvin", she replied that he "was a black guy that used to live down the street". (Tr. 355) It was obvious to Officer Fields that she was dying. She lived approximately ten minutes after her dying declaration. Moore was arrested at approximately 1:00 A.M. on July 10. In the trunk of his car were the Wilsons' stereo components, a quantity of pennies and a white plastic bucket.
Dr. George M. McCormick, II, coroner of Bossier Parish and a forensic pathologist, did the autopsy. Jo Ann Wilson had thirteen wounds which could be identified as stab wounds and three other minor wounds. She was wounded on her shoulders, arms, chest, back, and in the pelvic and abdominal areas. Seven of her stab wounds were potentially fatal. She died from loss of blood and shock. Her demise was described as follows:
"... the person starts to have a rapid heart rate, decreased blood pressure, possibly sweating and claminess, a sense of impending doom and gradually over a period of time loss of consciousness and finally death." (Tr. 496)
Dr. McCormick found her dying declaration not inconsistent with the wounds she had received. Jo Ann Wilson had had recent vaginal and rectal intercourse, both with ejaculation, probably within six to eight hours of the autopsy. There was a scar from the Caesarean delivery of her daughter. Some foreign hair in the vagina was removed.
Blood flakes from Moore's pants tested out as blood group O. Victim Wilson had blood group O. Sloan, Stewart, and Moore had blood group B. No blood was found on the clothing of either Stewart or Sloan. The foreign pubic hairs from Jo Ann Wilson did not match those of Sloan, Stewart or her husband, but exactly matched the pubic hair characteristics of Alvin Moore. One hair on the bed sheet matched all the characteristics of Alvin Moore's pubic hair.
Moore took the stand in his defense. He claimed that his intercourse with Jo Ann Wilson was voluntary; and that he had had voluntary intercourse with her on two previous occasions in May and June. In May, she had also given him money. He stated that he did not take the Kennedy half dollars; she gave them to him. Moore denied any knowledge of the stabbing.
Immediately before trial, Stewart and Sloan pled guilty to aggravated burglary. It was agreed that the State would recommend the maximum sentence of thirty years for each of them. Detective Glen Sproles, the chief investigating officer on the case, testified that he had discussed with defense counsel "during the pretrial" (Tr. 438) the fact that Dennis Sloan was going to plead guilty to aggravated burglary. Sloan's attorney, Patrick Phillips, testified that he had constantly attempted to secure an acceptable plea bargain for his *344 client. This bargain was reached on Friday but not accepted by Sloan until the following Monday, the day of trial.

ASSIGNMENT OF ERROR NUMBER ONE
Defendant contends that a continuance should have been granted when Stewart and Sloan pled guilty to aggravated burglary immediately prior to trial. Defendants were indicted on July 22, 1980, and arraigned on July 29. Trial was set for September 22, 1980. A motion for severance was denied on September 16, 1980. At that time, defense counsel also argued that he was entitled to a continuance. A discovery motion was answered on the same date. The answer to the motion included the forensic pathologist's report, the statements of the two co-defendants, and the report of the crime laboratory. Because of defense counsel's need to study these materials, a continuance was granted until October 27 when trial began. On October 27, defense counsel requested the additional continuance.
As a result of the co-defendants' pleas, defense counsel received the trial severance which he had requested. According to Detective Sproles' testimony, he was on notice that at least one of the co-defendants might plead guilty prior to trial. However, it is contended that their pleas changed the trial strategy and caused Moore to testify.
The question is whether denial of the continuance was prejudicial. Compare State v. Sims, 346 So.2d 664 (La., 1977).
In view of the dying declaration of Jo Ann Wilson and the physical evidence of Moore's guilt, he would surely have been convicted regardless of whether or not his co-defendants were tried at the same time. Their evidence against him was merely cumulative. Moore's were the pants with the victim's blood on them. He was the one named in the dying declaration. It was his car which contained the stolen goods. It was his pubic hair that was found in the victim.
The statements of the co-defendants had informed defense counsel of the gist of their testimony. He had their criminal records. Stewart and Sloan were cross-examined about those records. Sloan admitted a 1979 conviction of aggravated battery, reduced from a charge of attempted murder. Sloan also admitted a 1979 arrest for attempted armed robbery. Stewart admitted to some juvenile trouble and a theft conviction.
It is argued that Moore's testimony was the only means of impeaching the testimony of the co-defendants. However, Moore did not seek to shift the blame for the killing to either Sloan or Stewart. They did not dispute his contention that the intercourse with Jo Ann Wilson was consensual. Moore's testimony was not credible because of the physical evidence, not because it was contradicted by his co-defendants.
There is evidence that the co-defendants' pleas were not completely unexpected. Compare State v. Parsley, 369 So.2d 1292 (La., 1979).
Under these circumstances, defendant has not established any prejudice in the trial court's denial of a further continuance.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER TWO
Defendant contends that a mistrial should have been granted when the district attorney's opening statement indicated that the defendant should take the stand in his own defense. The district attorney stated:
"What is evidence comes from the witness stand and when I tell you something in this opening statement I want you to remember it, but I want you to remember whether or not I proved it with evidence from this stand, competent evidence from this witness stand. And if the defense decides to give an opening statement to say what they intend to prove you hold him to the same thing. You don't let me talk without me proving what I say. The same goes for the defense counsel. Don't *345 let him talk unless he produces proof to support what he has to say." (Tr. 322)
It is argued that the district attorney inferred there had to be evidence of innocence, and the only evidence which could be produced was defendant's testimony. Thus, these prejudicial remarks, together with the prejudice caused by the last minute severance and the denial of motion for continuance, forced defendant to testify.
Direct or indirect reference by the prosecution to the accused's failure to testify is a ground for mistrial. LSA-C.Cr.P. art. 770. In some instances, a reference to the State's testimony as uncontroverted focuses attention on the defendant's failure to testify. State v. Harvill, 403 So.2d 706 (La., 1981). However, this remark about the need for proof of facts alleged in an opening statement is not that type of reference. In Harvill, the comment was clearly prejudicial, because "only the defendant could recant the taped confession which formed the entirety of the prosecution's case against him." 403 So.2d 711. Here, in contrast to Harvill, any connection between the statement and the type of comment prohibited by Article 770 is very vague. Also, unlike Harvill, the physical evidence against Moore is overwhelming. Moore did take the stand and, with these facts, could not have relied on the presumption of innocence. There was no prejudice. The district attorney was merely cautioning the jury not to accept opening statements as evidence. He was not commenting on the defendant's possible failure to testify.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER THREE
It is contended that certain photographs of the crime scene should not have been allowed in evidence because they inflamed the jury by emphasizing the violence of the crime and depicted a bloody shirt and a stereo speaker which were not introduced into evidence.
The photographs were material and admissible. Their prejudicial effect is outweighed by their probative value. State v. Boyer, 406 So.2d 143 (La., 1981); State v. Vernon, 385 So.2d 200 (La., 1980). The items in the photographs would have been admissible evidence. State v. Morris, 340 So.2d 195 (La., 1976); State v. Hawthorne, 345 So.2d 1170 (La., 1977). Their depiction was allowable.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER FOUR
Defense counsel contended that he was entitled to a "rap sheet" on the victim in order to impeach her dying declaration. The State replied: "we have no criminal record on Jo Ann, we know nothing about her except for good things. I can'tI can't produce a criminal record because we have none on her." (Tr. 433) The defense asked that the State have the police run a record check on Jo Ann Wilson. The State responded: "We have previously given to Mr. Freeman all the criminal record reports that we have on the parties involved in this particular matter. There were three such, what we call rap sheets, that were furnished to Mr. Freeman. Those are the only rap sheets that we have involved in this case." (Tr. 436)
Detective Sproles, the investigating officer, was asked:
"Q. All right, sir, did you, as the investigating officer, do any investigation, and I mean as in any way, shape or form, in talking to neighbors, or in getting police records or anything about the background of the victim?
"A. We had search teams out there, I was not a part of one of the search teams. I did request through our records department for a check of anything on the three suspects we had or the victim.
"Q. All right, did anything come back?
"A. Not on the victim, no sir.
"Q. Did you run adid you ask for a record of the victim?
"A. I asked for a records check from our record's department, yes sir.

*346 "Q. All right, do we have anything, are any of those so called rap sheets, I don't know what else to call them, that's the best I can do, do you have a rap sheet on Jo Ann Wilson?
"A. No, sir.
"Q. Did you request one?
"A. I didn't particularly request a rap sheet, no sir." (Tr. 446)
The above does not suggest that Jo Ann Wilson had a "rap sheet". It appears probable that she did not.
The trial court refused to order the State to request a "rap sheet" on Jo Ann Wilson, but noted that the State was under a continuing order to produce any Brady[1] information, which would include conviction records of the victim. See State v. Henderson, 362 So.2d 1358 (La., 1978); State v. Harvey, 358 So.2d 1224 (La., 1978). This is all that is required.
The State did not have a "rap sheet" on Jo Ann Wilson. The indication is that one did not exist. The trial court properly ruled that the State was not required to make a further search for a conviction record on Jo Ann Wilson. State v. Washington, 407 So.2d 1138 (La., 1981).
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER FIVE
Defendant contends that the trial court erred in allowing certain hearsay evidence. LSA-R.S. 15:434.
Moore was quoted as saying he wanted to "check on his old house." (Tr. 584) The statement was allowed in evidence for its non-assertive value. It proved that the words had been spoken, not that they were true. See State v. Hatcher, 372 So.2d 1024 at 1032 (La., 1979). Thus, the evidence was not hearsay. It was relevant to show that the words were spoken by Moore prior to the parties' trip to Bossier City. There was no prejudice in allowing the statement into evidence because Moore admitted on the witness stand that he had gone with his companions to his old neighborhood on the day of the crime.
Defendant also contends that other statements made by Moore immediately before and after the crime should have been excluded as hearsay. These statements took place as immediate concomitants of Moore's criminal act. His spontaneous words uttered close in time to the occurrence were properly admitted into evidence as res gestae. LSA-R.S. 15:447; 15:448.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER SIX
Defendant contends that the prosecutor's closing argument contained highly prejudicial comments which violated his constitutional rights to due process of law. The prosecutor stated:
"... Today we're here also to protect the innocence and the future victims of crime. Dennis Sloan is not an innocent person, neither is Arthur Stewart, Jr. and by no means is this defendant today, Alvin R. Moore, Jr. Let's not forget who is the innocent party in this case. It's Jo Ann Wilson, her child, Regina, her husband, Aaron, her mother and father and sister. They are the innocent victims of this tragic, and terrible crime. Let's not forget about these people because that's what justice is about, not to forget about them. (Tr. 731)
* * * * * *
"She's the innocent victim of this crime. And justice requires that you vote guilty and you vote for life when you do. The life of every one of us to walk the streets free from this type of people. We're voting for our lives, the lives of our families to be free from this type of activity. Thank you." (Tr. 738)
There was no objection by defense counsel to these remarks. However, despite lack of objection, extremely inflammatory and prejudicial remarks require reversal. State v. Hayes, 364 So.2d 923 (La., 1978); *347 State v. Lee, 346 So.2d 682 (La., 1977). It is not clear why defense counsel failed to object to the prosecutor's argument. There was no motion for a mistrial at the conclusion of the closing statement. State v. Gaines, 354 So.2d 548 (La., 1978). Defense counsel indicated that he deliberately refrained from objection while listening to the prosecutor's "plea for pity". (Tr. 745)
A prosecutor should avoid remarks predicting societal costs and consequences of a not guilty verdict. State v. Barrow, 410 So.2d 1070 (La., 1982). However, "substantial evidence against defendant in the record prevents the errors in the prosecutor's argument from becoming such violations of due process rights that would require a reversal in the absence of defense objections." State v. Hayes, 364 So.2d 923 at 927 (La., 1978). In view of the overwhelming evidence of Moore's guilt, it is unlikely that the prosecutor's argument contributed to the verdict.
This assignment lacks merit.

DEATH SENTENCE REVIEW
Every sentence of death must be reviewed to determine if it is excessive. LSA-C.Cr.P. art. 905.9. The factors in that determination are set out in Supreme Court Rule 28. This court must determine: (a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors; (b) whether the evidence supports the jury's finding of a statutory aggravating circumstance; and (c) whether the sentence is disproportionate to the penalty imposed in similar cases.
A. PASSION, PREJUDICE, AND OTHER ARBITRARY FACTORS:
At the sentencing hearing, the prosecutor advised the jury that "From the next point forward it goes to the court system to be thoroughly reviewed and checked through every court in this land." (Tr. 776) The prosecutor's reference to appellate review was, of course, inaccurate and misleading. "Any prosecutor who refers to appellate review of the death sentence treads dangerously in the area of reversible error." State v. Mattheson, 407 So.2d 1150 at 1165 (La., 1981).
In State v. Willie, 410 So.2d 1019 (La., 1982), a more prejudicial argument resulted in the sentence being vacated.[2] The prosecution here did not give the impression that the jury was making only a tentative determination. On the contrary, the difficulty of the jury's decision was emphasized. The remarks here are not so prejudicial that the sentence must be vacated. As in State v. Mattheson, 407 So.2d 1150 (La., 1981), the references, although close to reversible error, did not induce the jury to believe that its responsibility was lessened by appellate review. The most objectionable phrase, "through every court in the land", is more in the nature of hyperbole than anything else. The remark did not deprive defendant of a fair trial in the sentencing phase.
In considering whether the verdict was influenced by prejudice, it is significant that the three co-defendants were black and the victim was white, as were all of the jurors. However, there is no reference at any point in the record to color, or appeal to racial prejudice. The crime was both violent and senseless; there is no indication that the verdict was influenced by prejudice.
B. AGGRAVATING CIRCUMSTANCES:
The jury found three aggravating circumstances:
"(1) The offender was engaged in the commission or attempted commission of aggravated rape, aggravated burglary and armed robbery;
"(2) The offender knowingly created a risk of death or great bodily harm to more than one person;
"(3) The offense was committed in an especially heinous, atrocious or cruel manner." (Tr. 40)
(1) Since Jo Ann Wilson was observed having sex on her living room floor; the *348 intercourse was both vaginal and anal; she afterward appeared frightened of Moore; and she was subsequently stabbed by Moore, the jury could have reasonably inferred that the sexual encounter between the two was not voluntary and that Jo Ann Wilson consented to it only because Moore had the knife with which she was subsequently killed. Thus, the jury could have found that Moore was engaged in the commission of aggravated rape. While there is some evidence that Moore's entry into the house was not forcible, Jo Ann Wilson was robbed and Moore was obviously armed. The jury could also have reasonably concluded that Moore committed an armed robbery.
(2) In finding that Moore created a risk of death or great bodily harm to more than one person, the jurors were apparently thinking of baby Regina. Although the murder of her mother certainly placed the child in an unprotected situation, she was not harmed or threatened. The evidence does not support this aggravating circumstance.
(3) Because of the number of wounds inflicted and the fact that Jo Ann Wilson died slowly with awareness of her impending death, the jury could reasonably have found that the offense was committed in an especially heinous, atrocious and cruel manner.
It is unnecessary for all three aggravating factors to be present. State v. Monroe, 397 So.2d 1258 (La., 1981). Two of the statutory aggravating circumstances found by the jury are present.
C. PROPORTIONALITY:
The only comparable crime is that reported in State v. Gaskin, 412 So.2d 1007 (La., 1982). Three white males picked up a young black girl in their car. They made her perform oral sex upon them, robbed her, and then stabbed her. Although two of them, Gaskin and Thomley, were found guilty of first degree murder, the jury recommended life imprisonment.
There are some distinguishing features in the two murders. The crime here took place in Jo Ann Wilson's home, which has traditionally been considered a place of security and sanctuary. In the Gaskin crime, the guilt was shared by two men because Thomley cut the victim's throat and Gaskin then stabbed her. Apparently, Gaskin and Thomley did not take the stand to impugn the character of their victim as did Moore. Moore's testimony on the stand was incredible and the jury undoubtedly felt more strongly about the offense because he slandered his victim and showed no remorse. It is impossible to compare the sex crimes in the two cases. The oral sex demanded from Gaskin and Thomley's victim was repugnant as was Jo Ann Wilson's anal and vaginal rape. However, Virginia Smith, the victim of Gaskin and Thomley, did not suffer the bodily invasion inflicted on Jo Ann Wilson. The jury may also have been influenced by the fact that Jo Ann Wilson was a young mother whose four month old baby not only witnessed her death, but was left motherless as a result. The child, as well as the mother, was a victim.
Gaskin was seventeen years of age at the time of his crime and Thomley a year older; Moore was twenty. A jury could understandably be more reluctant to impose a death sentence on a seventeen year old. Also, Gaskin is a person with mental, educational and emotional limitations. Moore, on the other hand, graduated in the middle of his high school class. He did not have a disadvantaged childhood, but has had a propensity for violence since his high school years.
Considering all the circumstances, the sentence of death imposed on Moore is not disproportionate to the sentence of life imprisonment imposed on Gaskin and Thomley.
For the foregoing reasons, the conviction and sentence of defendant, Alvin R. Moore, Jr., are affirmed.
AFFIRMED.
NOTES
[1] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[2] The writer dissented from this feature of the Willie decision.