LeBLANC, Judge.
Defendant, Jerry Wayne Tucker, Jr., was charged by grand jury indictment with the first degree murder of Ms. Frances Shelby Tucker, a violation of La.R.S. 14:30. Defendant entered a plea of not guilty to the charge. On the day trial was scheduled to begin, the state formally amended the indictment to a reduced charge of second degree murder, a violation of La.R.S. 14:30.1. Defendant pled not guilty to this reduced charge and, after trial by jury, was found guilty of the charge. The trial court sentenced defendant to imprisonment at hard labor for life without benefit of parole, probation or suspension of sentence. Defendant appealed, designating twenty assignments of error:
*61 1. The trial court committed error when it overruled the defense objection to hearsay testimony.
2. The trial court committed error when it ruled evidence admissible under State v. Prieur, 277 So.2d 126 (La.1973).
3. The trial court committed error when it overruled a defense objection.
4. The trial court committed error when it overruled a defense objection.
5. The trial court committed error when it sustained a state objection.
6. The trial court committed error when it sustained a state objection.
7. The trial court committed error when it overruled defense objections to State Exhibits 3-A, 3-B, 3-D and 3-G.
8. The trial court committed error when it overruled a defense objection.
9. The trial court committed error when it overruled a defense objection.
10. The trial court committed error when it denied defendant’s motion for a mistrial.
11. The trial court committed error when it overruled a defense objection.
12. The trial court committed error when it overruled a defense objection to State Exhibit S-31.
13. The trial court committed error when it overruled a defense objection to State Exhibit S-29.
14. The trial court committed error when it overruled a defense objection to State Exhibit S-30.
15. The trial court committed error when it overruled a defense objection to State Exhibit S-33.
16. The trial court committed error when it overruled a defense objection to State Exhibit S-39.
17. The trial court committed error when it overruled defense objections to State Exhibits S-38, S-38-A and S-38-B.
18. The trial court committed error when it sustained a state objection.
19. The trial court committed error when it denied defendant’s motion for a mistrial.
20. The evidence is insufficient to support the jury’s verdict of guilty as charged.
Assignments of error numbers three through seven, nine through eleven, thirteen through sixteen, eighteen and twenty were expressly abandoned by defendant in his appellate brief. Additionally, in regard to assignment number 12 (which alleged that the trial court erred by admitting State Exhibit S-31), defendant merely lists this assignment in his brief. No argument is made, and no authorities are cited relative to this assignment; consequently, assignment twelve is deemed abandoned. State v. Schaub, 563 So.2d 974, 974-975 and n. 2 (La.App. 1st Cir.1990); State v. Frelix, 484 So.2d 936, 938 (La.App. 1st Cir.1986); Uniform Rules — Courts of Appeal, Rule 2-12.4.
The record reflects that at about 4:45 a.m. on February 15, 1989, Jena Lee, a communications officer answering emergency 911 telephone calls, received a call from Ms. Frances Shelby Tucker, defendant’s paternal grandmother. Lee repeatedly asked Ms. Tucker if she knew who attacked her and Ms. Tucker replied in the negative, telling Lee that it was dark and that she could not see.
Baton Rouge City Police Officer Richard Todd Quebedeaux was the first officer to arrive at the victim’s Baton Rouge residence. The window in the top half of the back door of the residence was broken near the doorknob, and the door was open. Quebedeaux entered the residence through this door, which led into the kitchen. It was dark inside the house, and Quebedeaux used his flashlight for illumination. Que-bedeaux found the victim in the southwest bedroom, lying in front of the doorway. The telephone was next to her. Quebe-deaux had heard the victim talking on the telephone before he entered the residence. Quebedeaux asked the victim if she could give him a description of the person who had stabbed her. She could not speak and appeared to be close to losing consciousness, but she “shook her head no.” Emergency Medical Services personnel came to the scene and transported the victim to the hospital, where she was pronounced dead shortly thereafter.
*62 Dr. Alfredo Suarez, who was accepted by the trial court as an expert medical doctor in the field of pathology, testified that he performed an autopsy on the victim and determined that the cause of her death was exsanguination due to multiple stab wounds to the body. In addition to a number of defense wounds, the victim was stabbed in the neck and upper left portion of the chest; the chest wound, a wound about five inches deep, was determined to be the fatal wound. Dr. Suarez stated that he thought these wounds had been inflicted at about the same time, within minutes or seconds. Dr. Suarez further stated that the wounds seemed to have been inflicted by the same weapon, a sharp instrument with a blade about five inches in length.
A portion of the pane from the broken window in the back door of the victim’s house was missing. Officer Edward McCants was able to lift two latent fingerprints from a piece of glass which he removed from the back door. One of these prints, State Exhibit S-12, was lifted from the interior surface of the piece of glass; and the other, State Exhibit S-12-A, was lifted from the exterior surface of the same piece of glass.
At about 10:30 a.m. on February 15, Detectives Michael Vaughn and Keith Bauer went to defendant’s apartment to speak with defendant and obtain his fingerprints. At the detectives’ request, defendant voluntarily accompanied them to the detective office located on Mayflower Street. Defendant was fingerprinted at about 11:00 a.m. and advised of his Miranda rights at about 11:40 a.m. Thereafter, defendant gave Bauer and Vaughn an initial statement at about 2:00 p.m. At approximately 3:10 p.m. that same day, defendant was placed under arrest for the instant homicide, and booked into the parish prison at about 6:42 p.m. Subsequently, during the early morning hours of February 16, Bauer and Vaughn obtained a second statement from defendant. This statement, which was tape-recorded, was made after defendant was again advised of his constitutional rights.
At trial, Officer Brenda Micelli was accepted by the trial court as an expert witness in the area of fingerprint comparison and identification. She fingerprinted defendant in court and compared those fingerprints (S-13), to the latent fingerprints that had been lifted from the piece of broken glass which McCants had removed from the back door of the victim’s house (S-12 and S-12-A). Following the in-court comparison, Micelli positively identified exhibit S-12 as matching defendant’s. right index fingerprint and positively identified exhibit S-12-A as matching defendant’s right thumbprint.
Pursuant to a search warrant, the police seized exhibits S-33 (a floormat from the right side of a friend’s truck used by defendant on the night his grandmother was killed), S-35 (a blue T-shirt), and S-37 (a pair of blue jeans seized from a closet in the defendant’s apartment). George Schi-ro, an expert witness in the field of forensic serology, testified that he tested exhibits S-33, S-35 and S-37 for the presence of human blood. He determined that there was human blood on exhibit S-35, but was unable to type the blood. On exhibits S-33 and S-37, Schiro found blood, but he could not determine whether the blood was human.
In the taped statement he gave on February 16, 1990 (S-41), defendant stated that, at about 11:00 p.m. on February 14 as he was leaving work, he was stopped by Carlos, to whom he owed money for drugs. Carlos told defendant to meet him at the same location on the following night and that defendant “better have” at least two hundred dollars. After going home to change into a blue shirt and a red “do rag”, defendant proceeded to the victim’s house. After being initially unsuccessful in getting inside the victim’s house, defendant used a screwdriver and a pair of wire cutters to break a glass and enter the house. He went into the bathroom and turned off the light, after which he went into the living room and tried to turn on the light, which did not illuminate. After trying to find the victim’s purse, defendant was trying to walk “real quiet” toward the victim’s room when she surprised him. Defendant ran *63 toward her and tried to hold her down, while feeling for money on her person and under her pillow since he knew that the victim generally kept money on her person or under her pillow. Defendant stated that he “guess[ed]” that he grasped one of the pieces of glass (apparently from the window he had broken on the back door) from his pocket or grasped “something else” and stabbed her. According to defendant, he did not know what he used to stab the victim. This occurred at about 12:30-12:45 a.m. on February 15. The victim, at no time, called out defendant’s name. Defendant stated that, at the time, he was in a panic, explaining that earlier that night, when he left work, he had taken about ten hits of acid.
Defendant further stated that he went directly home after leaving the victim’s house. However, he indicated that, after leaving the victim’s home, the next thing he remembered was driving on Airline Highway. At that time, he noticed he had blood on his hands and “started freaking out.” When he arrived home, defendant went into the bathroom and washed his hands and proceeded to remove a piece of glass from his finger. He changed clothes before going to bed at about 3:30 or 3:45 a.m.
At trial, defendant took the stand and testified that his father was deceased, that he had not seen his mother since he was three years old, and that he had been raised by his aunt and uncle, Mary Ann Tucker and her husband, Huey Tucker. Defendant stated that he graduated from Glen Oaks High School in 1988; and, upon returning from his senior trip, he moved out of the home of Mary Ann and Huey Tucker into his grandmother’s (the victim’s) home, where he stayed for about eight months. According to defendant, he then moved to Lafayette. He stated that he moved away from his grandmother because he had started getting involved in drugs. However, he stayed at his grandmother’s residence when he was “low on money”.
At the beginning of February of 1990, defendant started working at Podnuh’s Bar-B-Q in Baton Rouge. At that time, defendant had just moved in with Jeffrey Harper and “Keston (sic) Stiles (sic).” Defendant testified that his main reason for not living with his grandmother was because he was selling drugs and did not want “it” around her.
Defendant testified at trial that, on the day before his arrest, he worked from 5:00 p.m. until 11:30 p.m. After work, he went to his apartment, changed his shirt and put on a “do rag”. He identified exhibit S-35 as the shirt and exhibit S-37 as the pants he had worn that day. After changing, defendant went to his grandmother’s house to talk to her about her telephone bill and her microwave oven, arriving there at about midnight. Defendant explained that a “guy” who had lived with he and his grandmother had charged long distance telephone calls to the victim’s telephone; and, regarding the microwave oven, defendant stated that he went to see the victim to tell her that he had gotten the microwave oven back (from Vance Gardner) and was going to return it to her. Upon his arrival at the victim’s house, defendant went to the victim’s bedroom window and knocked at the window as he usually did. He identified himself to his grandmother, who asked what he wanted. He replied that he had come to talk about the telephone bill and the microwave oven. The victim replied that she did not want to talk about the matter at that time, which made defendant “kind of mad”. Defendant went to the back door, cracked the window and tried to pull the glass out but could not. Defendant then went back to Harper’s truck, which he was using, and returned with a screwdriver, which he apparently used to pry out the glass. While removing the glass, defendant cut his fingers. Upon removing the piece of glass, defendant placed it in his back pocket. Defendant then unlocked the back door and went into the victim’s kitchen and turned on the light. The victim came into the kitchen, and she and defendant talked. The victim yelled, cursed and told defendant that he would have to pay for the broken window, too. However, they talked for about thirty minutes and eventually reached an agreement *64 whereby defendant would fix the window, contact the telephone company concerning the long distance telephone calls and return the microwave oven to the victim. After this conversation, defendant left the victim’s house at about 12:35 or 12:45 a.m. and returned to his apartment, arriving there at about 1:05 a.m.
Defendant testified that the victim was alive when he left her residence. He denied that he attacked her or that he had stabbed her.
Defendant admitted during his testimony that he had taken some acid, ten hits, just before he had left work on the evening before going to his grandmother’s house. Defendant stated that he did not know how the “hits” might have affected him that evening; however, he explained that “it leaves you in a, like a paranoid situation” and “sometimes, you hallucinate, you see things that ain’t (sic) really there.”
According to defendant, on the morning of February 15, after he had returned from his grandmother’s, he swallowed about ten “hits of acid” to dispose of these drugs when the police appeared at his apartment, because he thought the police were there in connection with the drugs. Defendant stated that taking these drugs made him paranoid and “every once in a while, something goes fuzzy on you, you know, and kind of looks like it’s moving on you but it’s really not.” Defendant stated that he did not remember what he told the police, and that, essentially by “hounding” him, the police had caused him to confess. Defendant explained that “hounding” meant that the police kept telling him that if he confessed they could help him out and “things will go a lot better for [him]”, calling him “names and stuff”, yelling at him, threatening him, putting the Bible in his face, telling him to place his hand on the Bible and swear that he did not kill the victim, and telling him he was going to burn in hell.[1]
ASSIGNMENTS OF ERROR NOS. ONE, TWO, EIGHT, SEVENTEEN AND NINETEEN:
In assignment one, defendant asserts that the trial court erred at the Prieur hearing by overruling defendant’s hearsay objection to testimony given by District Attorney Investigator Joseph Rawls. In assignment two, defendant claims that the trial court erroneously ruled at the Prieur hearing that other crimes evidence was admissible at trial. In assignment eight, defendant contends that the trial court erred in overruling his objection at trial to the admission of evidence of the alleged other crime. In assignment seventeen, defendant asserts that the trial court erred in overruling his objections to State Exhibits S-38 (a microwave oven), and S-38-A and S-38-B (photographs of the microwave oven in the vehicle in which it was found). Finally, in assignment nineteen, defendant submits that the trial court erred by overruling his motion for mistrial, which was premised upon the inadmissibility of the evidence of the alleged other crime.
The record reflects that before jury selection began on the first day of trial, the trial court conducted a Prieur hearing to determine the admissibility of other crimes evidence the state sought to admit at trial. The state had previously provided written notice to the defense of its intent to seek introduction of the evidence at issue, i.e., that prior to the instant charged offense defendant allegedly “broke into his grandmother’s house and stole her microwave *65 oven.”[2] At the beginning of the Prieur hearing, the prosecution indicated that it would present evidence that defendant had gone to his grandmother’s house and had stolen her microwave oven. The state called District Attorney Investigator Joseph Rawls to testify as to the substance of the testimony which Jeffrey Harper, a friend of defendant, would give at trial concerning the alleged theft.
Defense counsel objected to the use of this hearsay testimony on the grounds that it created the possibility that Harper might testify differently at trial from Rawls’ account of the anticipated trial testimony of Harper. The trial court overruled the objection, but stated that, assuming it found the other crimes evidence admissible, defendant would have the right to move for a mistrial if there was a variance between Rawls’ account of the anticipated testimony by Harper and the testimony Harper gave at trial.
Rawls then gave the following testimony as to statements he said Harper had made to him. Harper told Rawls that, although he was not certain of the exact date, he had driven defendant to the victim’s house, and that defendant went inside and brought back a microwave oven, with the intention of pawning it at a later date. A day or so before defendant’s grandmother was killed, Harper received a telephone call from defendant’s grandmother, who told him that she knew who had taken the microwave oven, that she wanted it back, and that she wanted Harper to tell defendant that if the microwave oven was not returned to her she would contact the police and report it as stolen. Harper related the substance of this conversation to defendant the day before his grandmother was killed. Rawls further testified that there was a microwave oven in evidence, which he assumed a family member could identify as the victim’s microwave oven.
After hearing arguments by counsel, the court ruled that this evidence was admissible under State v. Prieur and subsequent jurisprudence. In so ruling, the court stated that La.C.E. art. 404B(1) deals not only with “crimes and wrongs” but also “acts”, and that, while the state may not be able to prove (by clear and convincing evidence) a theft or unauthorized use of the microwave oven, the evidence at issue was an “act”.
At trial, the state introduced evidence regarding the alleged theft of the victim’s microwave oven which, although it differed slightly in some respects, conformed essentially to the substance of the evidence the state had previously indicated it would introduce at trial. In response, defense counsel moved for a mistrial on the basis that: (1) there was a variance between the evidence presented at the Prieur hearing and the testimony presented at trial concerning the alleged theft, and (2) that, in light of the trial testimony, the jury was free to infer that defendant had stolen his grandmother’s Christmas present. The trial court denied the mistrial, stating that any variance which existed was favorable to defendant, and that defendant had not been prejudiced thereby, since the court felt that the evidence presented at trial was less prejudicial to defendant than that which had been presented at the Prieur hearing.
On appeal defendant, citing State v. Hatcher, 372 So.2d 1024, 1026-1027 (La.1979), contends that the trial court erred in allowing Joseph Rawls to give hearsay testimony at the Prieur hearing. Defendant further asserts that the evidence pertaining to the alleged other crime which was subsequently introduced at trial varied substantially from that introduced through Rawls’ hearsay testimony at the Prieur hearing. Relying on this alleged variance, defendant makes two claims. First, he claims Rawls’ testimony at the Prieur hearing did not give him adequate notice of the nature and factual content of the other crimes evidence which the state sought to introduce. Second, defendant claims that Rawls’ pretrial testimony made it difficult, if not impossible, for the trial court to have a suffi *66 cient basis from which to make an intelligent decision as to the admissibility of the other crimes evidence. Defendant also argues that the requirement of State v. Prieur, 277 So.2d 126 (La.1973), that there be clear and convincing evidence that the defendant committed the alleged other crime, was not met by the state. Defendant concludes that his conviction should be reversed because the evidence of the alleged other crime served merely to show his bad character and actions in conformity therewith and, thereby, deprived him of a fair trial.
La.C.E. art. 404B(1) provides:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
La.C.E. art. 1103 further provides with respect to the admissibility of other crimes evidence as follows:
Article 404(B) and 104(A) neither codifies nor affects the law of other crimes evidence, as set forth in State v. Prieur, 277 So.2d 126 (La.1973), State v. Davis, 449 So.2d 466 (La.1984) and State v. Moore, 278 So.2d 781 (La.1972) and their progeny, as regards the notice requirement and the clear and convincing evidence standard in regard to other crimes evidence. Those cases are law and apply to Article 404(B) and 104(A), unless modified by subsequent state jurisprudential development, [emphasis added]
The last sentence of La.C.E. art. 1103, together with Official Comment (k)[3] to La. C.E. art. 404, demonstrate a legislative intent to retain the Prieur line of cases as law, subject to subsequent state jurisprudential development. See, State v. Lewis, 566 So.2d 1120, 1124 (La.App. 2nd Cir.1990).
As a prerequisite to the admissibility of evidence of other crimes, the state must within a reasonable time before trial furnish in writing to the defendant a statement of the acts or offenses it intends to offer, describing same with the general particularity of an indictment or information. State v. Hatcher, 372 So.2d at 1027; State v. Prieur, 277 So.2d at 130. Among other requisites, the state must establish by clear and convincing evidence that defendant committed the other crime(s). State v. Davis, 449 So.2d 466, 467-468 (La.1984); State v. Prieur, 277 So.2d at 129. Clear and convincing evidence is less than “beyond a reasonable doubt”, but more than a “preponderance of the evidence”. State v. Johnson, 458 So.2d 937, 941-942 (La.App. 1st Cir.1984), writ denied, 463 So.2d 593 (1985).
Defendant’s only argument as to the inadequacy of the state’s notification of intent to introduce the other crimes evidence is his allegation that Investigator Rawls’ pretrial testimony failed to provide defendant adequate notice of the nature and factual content of the other crimes evidence the state sought to introduce because of the alleged variance between Rawls’ pretrial testimony and the evidence presented at trial. We find no merit to this argument. While Rawls’ testimony recounting the information Harper had given him concerning the alleged theft of the microwave oven was hearsay (actually hearsay within hearsay), the trial court properly allowed this hearsay to be introduced at the Prieur hearing. See, La.C.E. art. 104 A; State v. Hatcher, 372 So.2d at 1027. We are satisfied that Rawls’ testimony at the Prieur hearing adequately *67 informed defendant of the nature and factual content of the other crimes evidence that the state sought to introduce during the trial and that the evidence of the alleged other crime introduced at trial substantially conformed to the factual content related through Rawls’ pretrial testimony.
While admissible at the Prieur hearing to inform defendant of the nature and content of the other crimes evidence and to enable the trial court to rule on the admissibility of the other crimes evidence, the statement of Harper, related through Rawls’ hearsay testimony, that the victim had told Harper she knew who had taken her microwave oven, that she wanted it back, and that she wanted Harper to tell defendant that if the microwave oven was not returned she would contact the police and report it as stolen, was itself hearsay. It was hearsay, because it was not made by the declarant, was offered to prove the truth of the matter asserted, and did not come within any of the recognized exceptions to the hearsay rules set forth in the Louisiana Code of Evidence. Further, this hearsay testimony was not competent evidence to establish the requisite clear and convincing proof that defendant had committed the alleged theft and was not admissible for this purpose. Because the state presented no other evidence at the Prieur hearing to prove defendant had taken the microwave oven without the victim’s consent, we agree with defendant that the state failed to meet its burden of clearly and convincingly proving that defendant committed the alleged theft. Thus, the trial court’s pretrial ruling that the evidence of the alleged other crime was admissible at trial was clearly wrong.[4] See, State v. Johnson, 458 So.2d 937, 943-944 (La.App. 1st Cir.1984) (on rehearing), writ denied, 463 So.2d 593 (La.1985).
The state’s assertion on appeal that, even in the absence of the requisite clear and convincing proof of defendant’s commission of the alleged other crime, the evidence was admissible as an “act” pursuant to La.C.E. art. 404B(1) is completely contrary to the provisions of La.C.E. art. 1103, which expressly retain the clear and convincing evidence standard of State v. Prieur in regard to other crimes evidence. The state’s interpretation would lead to the absurd result that whenever there was a failure to meet the requisite clear and convincing evidence standard as to other crimes evidence, the evidence at issue would nevertheless be admissible as an “act” of the defendant. We totally reject this construction of art. 404 B(l) as untenable.
Under La.C.Cr.P. art. 770(2), the introduction of inadmissible other crimes evidence is grounds for a mandatory mistrial. However, introduction of this inadmissible evidence does not constitute reversible error under the circumstances present in this case. Our Supreme Court has addressed similar situations and found erroneously admitted other crimes evidence insignificant when weighed against the offense for which the defendant was on trial. State v. Perry, 502 So.2d 543, 559 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987) (which involved a reference made by a state witness during defendant’s trial on five counts of first degree murder, to the theft of a radio, which reference the Supreme Court found paled in significance to the five counts of first degree murder and did not portray the defendant as a “bad man” capable of murder); See also, State v. Vernon, 385 So.2d 200, 205 (La.1980) and State v. Abercrombie, 375 So.2d 1170, 1176 (La.1979), cert. denied, 446 U.S. 935, 100 S.Ct. 2151, 64 *68 L.Ed.2d 787 (1980). In Vernon, a second degree murder case, the Supreme Court found that, although there should have been a pretrial notice to the defendant of the state’s intent to introduce other crimes evidence and a determination as to the admissibility of that evidence, introduction of the other crimes evidence was harmless, since in light of the entire record the Supreme Court could not say that knowledge of the arrest for carrying a concealed weapon would so influence the jury that it would unjustifiably convict the accused of a second degree murder. In Abercrombie, a first degree murder case, the Supreme Court found that a witness’s testimony should not have been admitted, but that its admission was not reversible, because the alleged other crime of vandalism was not of a nature that would have inflamed the jury to the point that it would have convicted the defendant of first degree murder.
In our view, the analysis and reasoning utilized in Perry, Vernon and Abercrombie are equally applicable herein. The erroneous admission of the other crimes evidence, i.e. the alleged theft of the microwave oven, pales in significance to the crime of second degree murder for which defendant was on trial, would not have portrayed defendant as a “bad man” capable of murder and, thus, would not have inflamed the jury to the point that the jury would have been influenced to convict defendant of murder. Accordingly, the error in admitting the evidence of the alleged theft was harmless beyond a reasonable doubt.
For the reasons assigned, these assignments lack merit. Defendant’s conviction and sentence are affirmed.
AFFIRMED.

. Notwithstanding the allegations of "hounding" made by defendant, in a written "JOINT AGREEMENT AND STIPULATION' filed on February 17, 1990, the defense stipulated in return for the state’s reduction of the original charge of first degree murder to the reduced charge of second degree murder that: (A) Vance Gardner was not in the state of Louisiana at the time of the homicide, (B) defendant would withdraw his motion to suppress his statement, and (C) defendant would agree to stipulate that his statement to Detectives Bauer and Vaughn on February 16, 1990, was admissible under La.R.S. 15:451 and 15:452 and that it was defendant’s and the state’s intention that the state may rely solely on this stipulation to establish the predicates required under those statutes. Later, during trial, the trial court ruled that, based on the stipulation, exhibit S-41 was admissible under the provisions of La.R.S. 15:451 and 15:452.

. The notice had been given in item number eleven of the state’s answer to defendant’s motion for discovery and inspection, which requested notification of the state’s intent to introduce other crimes evidence.

. This comment provides as follows:
(k) The first sentence of Paragraph B of this Article is not intended to change the law. See State v. Prieur, 277 So.2d 126 (La.1973); Art. 1103, infra. Although the second sentence of Paragraph B contains a longer list of purposes for which evidence of other crimes is admissible than that found in former R.S. 15:445-446, it generally accords with the rules actually applied by the Louisiana courts. State v. Kahey, 436 So.2d 475 (La.1983).

. The record reflects that at the conclusion of the Prieur hearing during discussions between the court, the defense and the state concerning limiting instructions in regard to the evidence of the alleged other crime, prosecutor Richard Johnson stated the following:
For one, we certainly can’t prove that theft. The only way we could prove that by competent evidence would be some how or the other to get in touch with the victim, Ms. Shelby Tucker, which I have no idea how—
In light of the foregoing statement and our finding that there was no clear and convincing proof that defendant committed the alleged theft, we need not and do not make any determination as to whether the other requirements for admission of evidence of the alleged other crime was met in this case.